THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. UMBERTO PERKINS, Defendant-Appellant.

First District (3rd Division)   No. 1—95—0218

Opinion filed September 30, 1997.

Freddrenna M. Lyle, of Chicago, for appellant.

Jack O'Malley, State's Attorney, of Chicago (Renee Goldfarb, James Fitzgerald, and Kay Hanlon, Assistant State's Attorneys, of counsel), for the People.

JUSTICE LEAVITT delivered the opinion of the court:

Defendant Umberto Perkins was a probational corrections officer at the Cook County jail in August 1992 when a new inmate, Erdogan Kurap, escaped. In September 1994, a jury convicted defendant of official misconduct (720 ILCS 5/33—3 (West 1992)) and aiding an escape (720 ILCS 5/31—7 (West 1992)) for his role in Kurap's escape. Defendant was sentenced to four years' imprisonment for each count, to run concurrently. Defendant now appeals, arguing, among other things, he should be granted a new trial due to the State's knowing use of the perjured testimony of two eyewitnesses, who denied receiving favorable treatment in exchange for their testimony. Because we find this contention has sufficient merit to justify a new trial, we do not address defendant's additional claimed points of error.

The evidence at trial revealed the following. Kurap had been the subject of an intense investigation by the State's Attorney's Office Drug Task Force and was eventually arrested and charged with a number of drug offenses. A $5 million cash bond was set, and he was sent to the Cook County jail, division 5, tier 1A. Defendant was assigned to this location at the time. Edward Kmet and Michael Hamilton, the two eyewitnesses for the State, were inmates in tier 1A when Kurap escaped.

Both Kmet and Hamilton testified about the events leading up to Kurap's escape. On August 12, 1992, Hamilton observed defendant taking a prisoner count, after which defendant entered the interlock and opened two cells. Kurap and his cellmate, Mark Hawkins, walked out of their cell, as did Peter Jones from the adjacent cell. Kurap spoke with defendant and held up a pair of pants he had been given "like he was seeing if they'd fit." Kurap put the pants in a bag and returned to his cell. He then asked for a razor and proceeded to shave off his mustache.

At approximately 1 a.m. on August 13, Kurap again met defendant in the interlock. Kurap used the phone, returned to his cell, and reentered the interlock wearing a correctional officer's cadet uniform. He exited a side door and was not seen again by either Kmet or

Hamilton. Defendant went to lunch 10 minutes after Kurap had exited the building. Defendant's shift ended that morning at 8 a.m., and Kurap's escape was not discovered until approximately 3 p.m.

Another correctional officer, Steven Dinkins, testified that on August 13 he had noticed defendant's wing was unusually dark and no televisions were on. Dinkins told defendant that some lights should be turned on and that defendant's supervisor would not be happy to find the wing as dark as it was. Defendant responded that he would "take care of it." Another correctional officer testified that the lights and televisions remained off throughout defendant's shift.

Taylan Ozaksut, owner of Milano's Pizza on Western Avenue and friend of Kurap and his family, testified that Kurap's father, Akif, came by Milano's on August 6, 1992, bringing with him a Turkish sausage and an envelope containing $100. Akif also questioned Ozaksut about a possible apartment for Kurap, which Ozaksut laughed off because he was aware of the $5 million bond set in Kurap's case. After receiving a call from Kurap, Ozaksut made three pizzas with the Turkish sausage. Ozaksut testified that someone, whom he identified in court as defendant, came by at 11 p.m. with a note from Kurap. The note said, "Taylan, give the pizzas to this friend." Ozaksut gave defendant the pizzas, along with the envelope from Akif.

According to Ozaksut, he received a call from defendant on August 13. Defendant asked whether Kurap had called, whether Akif had called, and whether either had left anything at Milano's for him. Ozaksut replied negatively and asked defendant why he just did not speak to Kurap directly about whatever was supposed to be left for him. Defendant then answered that he could not speak with Kurap because Kurap had gone on a "trip."

Ozaksut testified that defendant again came by Milano's on August 13, around 2 p.m., before business hours. Defendant again inquired as to whether Kurap or his father had left anything for him. After telling defendant nothing had been left for him, Ozaksut informed defendant that he had called the police and that they had denied Kurap was missing. When Ozaksut suggested defendant should inform the police of his knowledge of Kurap's escape, defendant replied that he did not want to "get involved."

Telephone records indicated a series of collect calls from the Cook County jail to Akif's residence on August 10. Each collect call was followed immediately by an outgoing call from Akif's residence to what was later revealed to be defendant's pager number.

Defendant was arrested on August 14 and, after being advised of his rights, gave a statement to the police. In that statement, defendant admitted that shortly after being assigned to division 5, tier 1A,

he was approached by two inmates on at least three occasions. These inmates informed defendant that they had a rich friend, Erdogan Kurap, who wanted some favors and that defendant could make $50,000 to $100,000 for assisting in Kurap's escape. Defendant stated that one day soon thereafter he went by a pizza place at 110th and Western on his way to work. There, he spoke with the owner, whom he knew as "John" (Ozaksut went by this name) and who informed him that there was $50,000 to $100,000 to be made in assisting Kurap's escape. This same "offer" was made to defendant over the telephone as well, by a woman claiming to be Kurap's girlfriend.

Defendant admitted going to the same pizza place at 1 p.m. on August 15. The restaurant was closed at the time, but "John" allowed him inside. When questioned by the detective as to why he had gone in excess of eight miles from his house for pizza, defendant admitted he had received another telephone call from Kurap's girlfriend, who had informed defendant that Kurap was out of jail. Defendant admitted he never told his superiors about any of these conversations.

A jury convicted defendant of both official misconduct and aiding an escape. He was sentenced to four years' imprisonment for each count, to run concurrently.

Defendant contends that his constitutional right to due process of law was violated because the State knowingly elicited false testimony from both Kmet and Hamilton regarding consideration they received for cooperating in the investigation of defendant. At trial, the State, on its own initiative, sought to establish that neither eyewitness to the escape had received favorable treatment in return for his testimony. Edward Kmet denied as much on direct:

"Q. Now in exchange for your testimony here today were you made any promises of leniency in order to testify not only today but before a grand jury that you've done previously?
A. No.
Q. You in fact did testify before a grand jury on October 1st of 1992, is that correct?
A. Yes.
Q. And were any promises made to you at that time in order to have you testify?
A. None."

The State elicited similar testimony from Michael Hamilton on direct:

"Q. Now in order for you to testify today were any promises made to you by anyone in order to get you to testify?
A. No, sir.

"Q. And in fact you testified before the grand jury on August 26th of 1992, is that correct?

A. Yes, sir.

Q. And at that time you were placed under oath just as you were today, is that correct?

A. Yes, sir.

Q. And were any promises made to you at that time?

A. No, sir.

Q. As to what you would receive for the cases that you had pending before a different Court, is that correct?

A. That's correct."

On cross-examination, defense counsel attempted—unsuccessfully in each case—to establish that both witnesses received favorable treatment for their cooperation in the present case. Kmet was cross-examined as follows:

"Q. Tell us this: You had to come to this courtroom today to testify about something that you said you saw Mr. Kurap do and a man named Hawkins and Mr. Perkins, right?

A. Yes, sir.

Q. Why is it that you've come here today?

A. I was asked to come here by the State's Attorney.

Q. Oh.

A. I was writted to be here.

Q. The State's Attorney came to see you in the jail?

A. No, sir.

Q. Did you make yourself known to some State's Attorneys early on in 1992?

A. Yes, sir.

Q. Why did you do that?

A. Because I felt it was the right thing to do."

Defense counsel similarly cross-examined Hamilton:

"Q. How many times have you served time in the penitentiary?

A. This is my second time.

Q. It's not a pleasant place to be, is it?

A. No.

Q. You would do most anything not to be there, wouldn't you?

A. Apparently not. I'm back.

Q. Well, you're back now but you want to get out, don't you?

A. Sure.

Q. And you would do most anything to get out, wouldn't you?

A. I don't understand your meaning.

Q. You don't want to be there, right?

A. Sir, it's like this here, I committed a crime; I'm paying my debt.

Q. And you're going to have to pay it?

A. Exactly.

Q. But you don't want to pay it all, do you?

A. But there's no way around that.

Q. You would do something—if somebody made you an offer for instance if you would help us out in a case would you do that in order to shorten your time if such an offer was made to you?

[Assistant State's Attorney]: Objection, Judge. Counsel knows that's legally impossible. He has to do his 12 [years, on a sentence imposed while defendant's case was pending].

THE COURT: I don't want any dialogue as to what the law is unless you're going to have some basis to predicate. The objection is sustained.

[Defense counsel]: My question, Judge, is simply would he do something, would he testify in an effort to get his time cut. That's all.

THE COURT: Counsel, I'm going to suggest you ask him if in fact there's been any promises made to him. That would be the basis for your question. Otherwise that answer is ambiguous and calls for more than one different response. That being the case propound a question.

[Defense counsel]: Would you like to have your time cut?

A. Sure.

Q. And is there anything that you wouldn't do to get your time cut?

A. Sure, there's [sic] a lot of things I wouldn't do."

In his recross of Hamilton, defense counsel again probed for potential bias:

"Q. This is the first time you ever came to court and testified against any officer in your life, isn't that right?

A. Yes.

Q. That's because you're trying to get your time cut?

A. No.

Q. You're looking for a favor from the State, aren't you?

[Assistant State's Attorney]: Objection.

THE COURT: He may answer the question.

A. No, I'm not looking for a favor from the State, Your Honor.

[Defense counsel]: You're in the habit of just helping them out?

A. No."

Prior to trial, defense counsel, as a result of the State's responses during initial discovery, filed a motion for supplemental discovery which specifically sought any and all information regarding benefits received by inmates who might testify against defendant at trial. Apparently no disclosures about either Kmet or Hamilton were made in the State's response to defense counsel's motion for supplemental discovery.

Defense counsel offered evidence at a hearing on defendant's motion for a new trial that both witnesses testified falsely and that the State had been aware of the perjurious nature of their testimony. By way of proffer, defendant introduced evidence that John Armelino represented Kmet on his earlier plea; that he sought to work out a plea agreement concerning Kmet before Kmet began to cooperate in the Kurap investigation; that the State recommended over 20 years' imprisonment in the course of Kmet's plea negotiations; and that after the judge was informed of Kmet's cooperation in the present case, Kmet was sentenced to only $8^{1}/_{2}$ years' imprisonment.

Defense counsel also introduced evidence that Hamilton received favorable treatment in exchange for his testimony against defendant. Peter Vilkelis testified that he had represented Hamilton in his earlier case; that the State recommended over 20 years' imprisonment for a plea of guilty; that the trial judge initially offered Hamilton 17 years' imprisonment; that Vilkelis then learned of Hamilton's cooperation in the Kurap investigation and reconferenced the case; that at the second conference the assistant State's Attorney told him the trial judge would be informed of Hamilton's participation in the Kurap investigation; that the trial judge was so informed; and that, as a result, Hamilton received a sentence of only 12 years.

On appeal, the State concurs in the above recitation of events. The State argues such facts need not have been disclosed to the jury since it was the trial judge's decision to reduce both witnesses' sentences and there was no evidence the State specifically asked for or offered sentence reductions.

We reject this attempted distinction as illusory. Both Kmet and Hamilton received sentences significantly lower than those recommended by the State after a judge was informed—by the State, no less—of each individual's cooperation in an ongoing investigation. Nor can the State claim there was no perjury here because it was the trial judge's ultimate decision to impose lesser sentences. Informing the trial judges about each witness' cooperation was intended to bring about lower sentences for both Kmet and Hamilton—which it did. That no formal contract was signed to which the State lent its signature is of no import. Both witnesses were placed under oath and brought before the grand jury, subjecting each to a perjury charge in the event either reneged on his implicit agreement with the State to testify adversely to defendant at his trial.

■ Thus, the testimony of both Kmet and Hamilton regarding what, if any, favorable treatment they received in exchange for their cooperation was either substantially misleading or outright false. As our supreme court has just recently emphasized, the State's knowing

use of perjured testimony to obtain a criminal conviction violates a defendant's right to due process of law. *People v. Olinger*, 176 Ill. 2d 326, 345, 680 N.E.2d 321 (1997); see also *Napue v. Illinois*, 360 U.S. 264, 269, 3 L. Ed. 2d 1217, 1221, 79 S. Ct. 1173, 1177 (1959); *People v. Jimerson*, 166 Ill. 2d 211, 223, 652 N.E.2d 278 (1995); *People v. Mc-Kinney*, 31 Ill. 2d 246, 247, 201 N.E.2d 431 (1964); *People v. Lueck*, 24 Ill. 2d 554, 556, 182 N.E.2d 733 (1962). The same principles apply even when the State, although not soliciting the false evidence, allows it to go uncorrected when it appears. *Olinger*, 176 Ill. 2d at 345. Nor does it matter that the witness' false testimony goes only to that witness' credibility; the resulting conviction is nonetheless tainted. *Jimerson*, 166 Ill. 2d at 224. This is so because the " 'jury's estimate of the truthfulness and reliability of a given witness may well be determinative of guilt or innocence, and it is upon such subtle factors as the possible interest of the witness in testifying falsely that a defendant's life or liberty may depend.' " *Olinger*, 176 Ill. 2d at 345, quoting *Napue*, 360 U.S. at 269, 3 L. Ed. 2d at 1221, 79 S. Ct. at 1177.

In *Olinger*, a key prosecution witness, Edward Stalder, testified against the defendant and admitted that, in exchange for his testimony, the State had agreed to dismiss a burglary charge then pending against him. Stalder had, in fact, obtained a multijurisdictional deal whereby a number of other charges pending against him in other jurisdictions were dropped as well. *Olinger*, 176 Ill. 2d at 347-48. Stalder was questioned on direct about any deals he had with the State's Attorney of Whiteside County, and he testified the "only agreement" he had involved dropping a burglary charge. *Olinger*, 176 Ill. 2d at 346. Our supreme court found the defendant had made a substantial showing that Stalder committed perjury and that the State had allowed Stalder's false testimony to go uncorrected. *Olinger*, 176 Ill. 2d at 348. The *Olinger* court then remanded the matter for an evidentiary hearing to determine whether the defendant's right to due process of law had been violated. *Olinger*, 176 Ill. 2d at 352.

*Olinger* makes clear that even where a jury is misled only as to the *extent* of a witness' potential bias, a due process violation may result, and the literal truth of a disclosure will not necessarily guarantee an untainted conviction. It could be argued that Stalder's testimony in *Olinger* was technically truthful, since Stalder was only questioned about what Whiteside County officials had agreed to do for him in exchange for his testimony. (Those officials had agreed to drop a burglary charge, but that was all they could have done for Stalder. The other charges which were dropped or compromised as part of the "global settlement" were in other state and federal jurisdictions.) Yet the *Olinger* court concluded the defendant was

entitled to an evidentiary hearing on his claim, since the extent of Stalder's bargain (and thus the extent of his motive to testify falsely) was understated to the jury.

■ The situation in this case is worse. While the colloquy between the State, Kmet, and Hamilton at trial was, as in *Olinger*, literally true (it is true that no *promises* of leniency were made by the State in this case), the jury was, nevertheless, misled. The jury here was never informed of *any* motive of either witness to fabricate his testimony, much less the extent of such a motive. Even if it is technically true the State made no specific promises to each witness in exchange for his testimony, the fact remains that each witness *did* receive a reduced sentence as a result of his cooperation in the present case. Leniency bargained for and received went undisclosed to both defense counsel and the jury. See *Jimerson*, 166 Ill. 2d at 227 ("[t]he fact that [the agreement between the witness and the State] may not have satisfied the traditional requirements for an enforceable contract is immaterial" to due process analysis); *McKinney*, 31 Ill. 2d at 250-51 (holding that State was required to disclose an offer of leniency made to a witness prior to defendant's first trial, even though the offer was allegedly withdrawn by the State prior to defendant's second trial, since due process cannot hinge upon such "gossamer distinctions"); *People v. Nino*, 279 Ill. App. 3d 1027, 1037, 665 N.E.2d 847 (1996) (finding State's witness' denial of favorable treatment impermissibly misleading where, although there were no specific promises of leniency by the State, common sense dictated that there was an "unspoken understanding" that the witness would be treated favorably in exchange for his testimony).

Further, it is clear the prosecution knew of the lenient treatment received by both Kmet and Hamilton in exchange for their testimony and, nevertheless, let the misleading testimony go uncorrected. See *People v. Brown*, 169 Ill. 2d 94, 106, 660 N.E.2d 964 (1995) (State's use of perjured testimony must be "knowing" to rise to the level of a due process violation). One of the prosecutors who tried this case participated in the earlier negotiations with Hamilton and was, therefore, aware of his potential motive to testify falsely. Regardless, the prosecutor actually trying a case need not have known that the relevant testimony was false in order to establish a due process violation; knowledge on the part of any representative or agent of the prosecution is sufficient. *Olinger*, 176 Ill. 2d at 348. No argument can be made in this case that the sentencing of both Kmet and Hamilton proceeded without the participation of one or more members of the State's Attorney's office.

Rather than admit both Kmet's and Hamilton's testimony was

substantially misleading, if not outright false, the State claims the record shows the jury was, in fact, informed of the witnesses' potential biases. However, the State can only point to one statement, made in the course of closing argument, which could have disclosed to the jury the lenity received by Kmet and Hamilton in exchange for their cooperation. Regarding Kmet and Hamilton, the prosecutor stated during rebuttal:

> "*They're not getting a break.* Was a judge told—were we advised before they were on our side? Sure. Did they plead guilty? No. They helped us on a significant case? Sure did. *But they're not getting more of a break then [sic] they got.* They got eight and a half and 12 [years] and that may not sound like much but we're not doing the time." (Emphasis added.)

We disagree with the State that the previous passage demonstrates "the prosecutor could not have been more direct" in bringing out the fact that both witnesses' sentences were reduced as a result of their cooperation in this case. In fact, we can hardly imagine a more obfuscating attempt. The first sentence above *suggests no breaks* were given, while the latter statement cryptically hints otherwise. Even if it could be discerned from the prosecutor's single, self-contradictory remark that both Kmet and Hamilton *had* been treated leniently in exchange for their testimony, no indication is given as to the extent of such favorable treatment. See *Olinger*, 176 Ill. 2d at 350-51 (holding disclosure of mere fact of "a motive" insufficient where extent of such motive is not revealed).

The context of the remark further diminishes the possibility—already remote—that the jury learned anything of both witnesses' potential motives to lie. The prosecutor's lone comment was made in rebuttal in his closing argument, long after defense counsel's opportunity for cross-examination and exploitation of the witnesses' motives to lie had expired. We hold that such a comment could not have saved the prosecution's earlier, knowing failure to divulge the potential biases of its two occurrence witnesses, Kmet and Hamilton. See *People v. Tidwell*, 88 Ill. App. 3d 808, 812, 410 N.E.2d 1163 (1980) (prosecutor's admission in closing argument that State's witness had, contrary to his testimony, been promised leniency in exchange for his testimony insufficient to cure error).

A conviction obtained by the knowing use of perjured testimony must be set aside if there is any reasonable likelihood the false testimony could have affected the jury's verdict. *Olinger*, 176 Ill. 2d at 349; *Jimerson*, 166 Ill. 2d at 224. While we acknowledge there is other, substantial evidence of defendant's guilt in this case, the State has not argued the evidence against defendant was otherwise

overwhelming. In light of defense counsel's repeated and strenuous attempts to uncover both Kmet's and Hamilton's potential biases and the fact that the perjurious testimony in this case came from the only two State's witnesses who allegedly observed Kurap's escape, we cannot reasonably conclude there is no likelihood the false testimony affected the jury's verdict. *Olinger*, 176 Ill. 2d at 349.

For the foregoing reasons, we reverse defendant's convictions and remand this matter for a new trial.

Reversed and remanded.

COUSINS, P.J., and CAHILL, J., concur.