THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. KENNETH HANSEN, Defendant-Appellant.

First District (3rd Division)    No. 1—02—3190

Opinion filed August 25, 2004.—Rehearing denied September 22, 2004.

Northwestern University School of Law/Bluhm Legal Clinic, of Chicago

(Karen L. Daniel and James E. Raley, and Rena Thiagarajan and Rohith Thumati, law students, of counsel), for appellant.

Richard A. Devine, State's Attorney, of Chicago (Renee Goldfarb, Peter Fischer, and Carol L. Gaines, Assistant State's Attorneys, of counsel), for the People.

PRESIDING JUSTICE HOFFMAN delivered the opinion of the court:

This appeal comes before us following a second jury trial in which the defendant, Kenneth Hansen, was convicted of the 1955 murders of 13-year-old Robert Peterson, 13-year-old John Schuessler, and 11-year old Tony Schuessler. Having elected to be sentenced under the Unified Code of Corrections (Ill. Rev. Stat. 1973, ch. 38, par. 1001—1—1 *et seq.*), the defendant was sentenced to concurrent prison terms of not less than 200 years and not more than 300 years. On appeal, the defendant contends that: (1) the circuit court erred in refusing to admit certain exculpatory evidence under the former testimony exception to the hearsay rule; (2) he was deprived of due process by the State's failure to correct a key witness's false testimony; and (3) the circuit court erred in allowing certain prejudicial testimony implicating him in another crime. For the reasons that follow, we affirm.

The defendant was first convicted of the murders following a jury trial in 1995. While his direct appeal was pending, the defendant filed a petition for postconviction relief, seeking a new trial on the ground that he had newly discovered evidence of his innocence consisting of a statement made by Joyce Saxon implicating her ex-husband in the murder of the three boys. Following an evidentiary hearing, the circuit court denied the defendant's postconviction petition. The defendant's appeal from the denial of his postconviction petition was consolidated with his direct appeal. In that appeal, this court found that certain evidence had been improperly admitted at trial and, as a consequence, reversed the defendant's convictions and remanded the case to the circuit court for a new trial. *People v. Hansen*, 313 Ill. App. 3d 491, 729 N.E.2d 934 (2000). In light of our remand for a new trial, the defendant's appeal from the denial of his postconviction petition was rendered moot. *Hansen*, 313 Ill. App. 3d at 508.

A second jury trial, which is the subject of the instant appeal, was held in 2002. The State presented the following evidence at trial.

Ernest Niewiadomski testified that, shortly after 7:30 p.m. on October 16, 1955, he saw the victims at a bowling alley wearing baseball jackets. According to Ralph Helm, sometime between 8:30 and 9 p.m., he saw a boy he later identified as Tony Schuessler hitch-

hiking on the street, and two other boys dressed in "sports jackets" standing nearby. Hetty Salerno testified that, at approximately 9:30 p.m., she heard two screams coming from the direction of the Idle Hours Stable, which was located near the forest preserves where the victims' unclothed bodies were discovered two days later.

Dr. Edmond Donoghue, who was qualified as an expert in the field of forensic pathology, opined that Tony Schuessler was manually strangled, John Schuessler had been strangled in a manner consistent with a choke hold, and Robert Peterson had been strangled with an item such as a belt or rope. On cross-examination, the doctor testified that he found no evidence of oats, hay, horse manure, barley, horse feed, or animal hair on the victims' bodies. He further stated that, although the bodies were found unclothed, there was no evidence of semen or anal penetration.

Herbert Hollatz testified that, in 1952, when he was in his early 20s, he lived and worked for the defendant at the Park Ridge Stable for three or four months. After leaving the stable, Hollatz again saw the defendant in October 1955, at which time he told Hollatz that he wanted to talk to him about something. According to Hollatz, the defendant told him that he "was the one [who] killed them three boys" a week earlier. The defendant said that someone told him to kill the boys and threatened that, if Hollatz told anyone, the defendant's brother, Curtis, "would take care of things." Hollatz stated that he first told the authorities about the incident when he was approached by an assistant State's Attorney in April 1995.

Patrick Mason had testified at the defendant's first trial but, because he had died in 1997, his prior testimony was read to the jury. Mason stated that, in 1956, when he was 11 years old, he worked at the Bro-Ken H Stables on the weekends and one day walked in on the defendant performing oral sex on a 15-year-old boy. The defendant later approached Mason and told him that, if he told anyone what he had seen, he would "wind up in the woods like those other boys."

Roger Spry testified that he began living with the defendant's family in 1960 when he was 10 or 11 years old and continued to live with them for approximately 20 years. Spry stated that, when he was about 15 years old, the defendant had told him that he once picked up three boys, took them to a barn, and then sent the older boy off to do something so he had the two younger boys alone. According to the defendant, he was having sex with the two younger boys when the older boy walked in on them and threatened to report what the defendant had done. The defendant told Spry that he grabbed the older boy's throat and accidentally choked him to death, leaving him no choice but to kill the other two boys. He also told Spry that Silas

Jayne arrived and helped him dump the bodies off in the forest preserves. Spry stated that the defendant referred to one of the boys as "Peterson." He testified that, several months later, the defendant caught him pocketing money from riders at the stable and told him, "you're going to end up just like that Peterson boy." Spry acknowledged that he first told law enforcement officials about the defendant's statements in August 1994 while facing prosecution for arson and that, in exchange for his testimony in this case, his sentence in the arson case was being reduced.

William Wemette testified that he lived at the Sky High Stables "off and on" between 1968 and 1970 during which time he had "at least a dozen" conversations with the defendant about the murders. During these conversations, the defendant had asked Wemette if he knew about "the Peterson boys," stating that it was a very famous case. The defendant told Wemette that he picked up the three boys hitchhiking and took them to the Idle Hours Stable. According to Wemette, the defendant told him that he sent the two older boys away and took the younger boy into a room, where he performed oral sex on the boy. When he finished, the other two boys walked in and threatened to call the police or their parents. The defendant told Wemette that he called his brother, Curt, for assistance. The defendant further stated that Curt injured one of the boys with a blunt instrument and then helped him choke the boys. The defendant told Wemette that, in order to avoid getting caught by the police, he had moved to the south side of Chicago and that someone had burned down the Idle Hours Stable for him. On cross-examination, Wemette admitted that he had been a paid informant for the Federal Bureau of Investigations from 1971 through 1989. He testified that he provided information to the government in the defendant's case and stated that he was reimbursed for expenses and was also given a "reward," but he could not remember the exact amount.

Joe Plemmons testified that he began leasing part of the Sky High Stables from the defendant in 1972 and became good friends with him during that time. Plemmons stated that, in May 1972, the defendant told him that his brother, Curt, "held those boys over his head like a club." According to Plemmons, sometime in 1976, he and the defendant had a conversation during which the defendant commented that "it was either those boys or him" because "in 1955 you couldn't be gay." On another occasion in 1988, Plemmons brought up the subject of the three murders and the defendant confided that he worried about being caught someday. Plemmons admitted that he had been convicted of fraud and has been known by several aliases. Plemmons also admitted that he came forward with the information relat-

ing to the defendant in November 1994 because he believed that the defendant had lied to him about "what happened to his wife Beverly." Following Plemmons' testimony, the State rested.

The defendant presented the testimony of three witnesses who stated that he did not work at the Idle Hours Stable during the relevant time period. Frank Jayne, whose testimony from the first trial was read to the jury, testified that from 1950 to 1960, his brother, Silas, owned the Idle Hours Stable and that the defendant did not work there. Barbara Ashbaugh, who was an instructor at the stable in 1954, stated that she never saw the defendant there. Finally, Dorothy Jayne testified that the defendant did not work at the stable from 1954 to 1966 while she worked there.

Dr. Shaku Teas, qualified as an expert in forensic pathology, testified that, after reviewing the victims' autopsy reports, it was her opinion that the deaths of John and Tony Schuessler occurred within two to three hours after they ingested their last meal which, according to their parents, was at approximately 1:30 p.m. The defense then rested.

In the State's rebuttal, Dr. Donoghue stated that he disagreed with Dr. Teas' opinion regarding the victims' time of death. It was Dr. Donoghue's opinion that examining digestive rates is an unreliable method of determining a person's time of death. Lance Williamson testified in rebuttal that the defendant had told him that he worked for Silas Jayne at the Idle Hours Stable in the 1950s. Dave Hamm, a former investigator with the Illinois State Police, similarly testified that the defendant told him that he had worked for Jayne at the Idle Hours Stable.

The jury subsequently found the defendant guilty of the first degree murder of the three boys. The defendant was sentenced to concurrent prison terms of not less than 200 years and not more than 300 years. Thereafter, the defendant filed a motion for a new trial, which the circuit court denied. He now appeals.

The defendant first contends that the circuit court erred in refusing to admit the prior testimony of Joyce Saxon under the "former testimony exception" to the hearsay rule.

The record shows that, while the defendant's direct appeal following his first trial was pending, he filed a postconviction petition alleging, *inter alia*, that he had newly discovered evidence of his innocence consisting of Saxon's statement that her ex-husband, Jack Reiling, had admitted to committing the murders. In 1998, an evidentiary hearing was held on the defendant's postconviction petition, and the crux of Saxon's testimony at the hearing was that, a few months after the murders occurred, she and Reiling had a heated argument, at

which time Saxon screamed, "And you killed those three boys, didn't you" to which Reiling responded, "Yes, I did." The circuit court, finding Saxon to be an incredible witness, denied the defendant's postconviction petition.

On remand for a new trial, the defendant filed a "motion *in limine* to admit [the] extra-judicial confession of Jack Reiling" and attached in support thereof portions of Saxon's testimony from the postconviction hearing relating to Reiling's alleged confession. After assessing the factors set forth in *Chambers v. Mississippi*, 410 U.S. 284, 35 L. Ed. 2d 297, 93 S. Ct. 1038 (1973), relating to the admissibility of extrajudicial third-party confessions, the circuit court granted the defendant's motion. Approximately a week before the second trial was scheduled to begin, however, defense counsel filed a motion to admit the prior postconviction testimony of Saxon, along with the testimony of Frank Jayne from the first trial. According to the motion, both Saxon and Jayne were physically and mentally unable to testify at the defendant's second trial. With respect to Saxon, specifically, defense counsel attached an unsworn letter, dated July 19, 2002, from her psychiatrist, Dr. Michael Brilliant, stating that Saxon's physical and mental health had deteriorated over the past several years, that she was being treated for major depressive disorder since 1997, that her testimony would not be accurate due to her memory impairment, and that the stress of testifying could exacerbate her illness. Also attached to the motion was an unsworn letter, dated June 19, 2002, from her treating physician, Dr. Reinhold Llerena, stating that, "[f]rom a physical standpoint[,] [Saxon] may be able to endure a short period in court, but I highly doubt she would be able to withstand a full day of courtroom hardship."

At the hearing held on the defendant's motion, the State argued that it had just received psychiatric records relating to Saxon a few days earlier and that, had defense counsel turned them over in 1998, the State could have investigated the matter. Defense counsel responded that he had no doubts about Saxon's competency to testify in 1998, but became concerned about her mental and physical ability when he went to see her six months before trial. According to defense counsel, it was at that time that he asked Saxon's family to contact her doctors for their opinions on this matter. After considering the parties' arguments, the trial judge denied the defendant's motion, stating:

> "Based on the allegations set forth in Defendant's motion to admit the prior testimony of Joyce Saxon and Frank Jane, [*sic*] Sr.[,] as a matter of law, there is not a sufficient basis upon which this Court could conclude that either witness is legally unavailable

for purposes of the former testimony exception to the Hearsay Rule. Based on what has been presented to this Court to date, the motion is denied.

Certainly, if further information becomes available, I would not preclude you from bringing that to the Court's attention. But based on the two letters introduced in support of the motion, it is denied." The defendant did not provide any further documentation in support of Saxon's alleged physical or mental impairment. He did, however, supplement his motion to admit Jayne's prior testimony with detailed sworn affidavits about his physical and mental condition. The circuit court later admitted Jayne's prior testimony at the defendant's trial.

Based on the facts set forth above, the defendant now argues that the circuit court erred in refusing to admit Saxon's prior postconviction testimony under the former testimony exception to the hearsay rule. According to the defendant, the letters from the two doctors attached to his motion were sufficient to demonstrate that Saxon was "unavailable" to testify at trial due to a physical and mental illness. We disagree.

■ Under the former testimony exception to the hearsay rule, the prior testimony of a witness may be admitted into evidence at trial if the party seeking to introduce the testimony can show that the witness is unavailable and was subject to competent cross-examination at the prior proceeding. *People v. Rice*, 166 Ill. 2d 35, 39, 651 N.E.2d 1083 (1995); *People v. McCambry*, 218 Ill. App. 3d 996, 1000, 578 N.E.2d 1224 (1991). In determining the circumstances under which a witness is deemed to be "unavailable," our supreme court has found the definition of unavailability set forth in Rule 804 of the Federal Rules of Evidence to be instructive. Fed. R. Evid. 804; *People v. Johnson*, 118 Ill. 2d 501, 517 N.E.2d 1070 (1987). Unavailability, as defined in Rule 804, includes the situation where a declarant "is unable to be present or to testify at the hearing because of death or then existing physical or mental illness or infirmity." Fed. R. Evid. 804(a)(4). Our supreme court explained that "[t]he general thrust of [Rule 804] makes clear that 'unavailability' is a narrow concept, subject to a rigorous standard." *Johnson*, 118 Ill. 2d at 509.

■ The parties disagree over the appropriate standard of review to be applied in reviewing the circuit court's decision to exclude Saxon's prior testimony. The defendant argues that our review is *de novo*, as there are no factual or credibility issues involved. The State, on the other hand, contends that we should review deferentially the circuit court's exclusion of Saxon's testimony. We agree with the State in this regard. Although it is true that reviewing courts sometimes review evidentiary rulings *de novo*, this exception to the general rule of defer-

ence applies in cases where " 'a trial court's exercise of discretion has been frustrated by an erroneous rule of law.' " *People v. Caffey*, 205 Ill. 2d 52, 90, 792 N.E.2d 1163 (2001), quoting *People v. Williams*, 188 Ill. 2d 365, 369 (1999). Such is not the case here. Accordingly, we will review the circuit court's evidentiary rulings with deference to the court, and its decision on this matter will not be reversed absent an abuse of that discretion. *Caffey*, 205 Ill. 2d at 89.

■ In this case, the letters submitted by Drs. Llerena and Brilliant are insufficient to support Saxon's alleged physical or mental illness, as neither letter was in the form of a sworn statement or an affidavit. See *Curt Bullock Builders, Inc. v. H.S.S. Development, Inc.*, 261 Ill. App. 3d 178, 634 N.E.2d 751 (1994) (claim of unavailability of a witness must be supported by affidavit or testimony). Further, as to Saxon's purported physical impairment, although Dr. Llerena's letter listed Saxon's medical problems and stated that she would not be able to withstand a full day of testifying in court, he also stated that Saxon may be able to endure a short period of time in court, thereby defeating the defendant's claim that Saxon would be unable to testify due to a physical incapacity. With respect to Saxon's mental ability, Dr. Brilliant's letter stated that Saxon was being treated for major depressive disorder, that her physical and mental health has deteriorated significantly over the past several years, that her testimony would not be accurate due to her "memory impairment," and that the stress of testifying could exacerbate her illness. However, the State, in its response to the defendant's motion for a new trial, attached Dr. Brilliant's letter, dated only a month earlier, in which he stated that Saxon "is relatively stable on current medications," but that the stress of testifying in court could exacerbate her illness. Moreover, we note that, when making its ruling, the circuit court offered to reconsider the issue if the defendant brought further evidence in support of Saxon's and Jayne's unavailability. Although the defendant provided sworn affidavits in support of Jayne's unavailability, he elected not to do so with respect to Saxon.

Based on the particular facts present in this case, we cannot say that the circuit court abused its discretion in finding insufficient proof of Saxon's unavailability, thereby excluding her prior postconviction testimony at the defendant's second trial.

■ The defendant next contends that he was denied due process when William Wemette falsely denied receiving $14,500 from the government in exchange for his cooperation in the case and the State failed to correct his testimony.

The State's knowing use of perjured testimony to obtain a criminal conviction violates a defendant's right to due process of law. *People v.*

*Page*, 193 Ill. 2d 120, 156, 737 N.E.2d 264 (2000); *Napue v. Illinois*, 360 U.S. 264, 269, 3 L. Ed. 2d 1217, 1221, 79 S. Ct. 1173, 1177 (1959). A conviction obtained by the knowing use of false testimony must be set aside if there is any reasonable likelihood that the false testimony could have affected the jury's verdict. *Page*, 193 Ill. 2d at 156; *People v. Olinger*, 176 Ill. 2d 326, 345, 680 N.E.2d 321 (1997). These principles likewise apply where the State, although not soliciting the false testimony, allows it to go uncorrected. *Page*, 193 Ill. 2d at 156-57; *Olinger*, 176 Ill. 2d at 345. This is true even where a witness's false testimony goes only to his credibility. *Olinger*, 176 Ill. 2d at 345.

The record shows that, at the defendant's first trial, Wemette testified that he had been a "mole" for the Federal Bureau of Investigations from 1971 through 1989 and was paid less than $25,000 in exchange for his assistance. With respect to how much money he received in the defendant's case, defense counsel elicited the following testimony from Wemette at the defendant's first trial:

> "[Defense counsel]: The government, the United States of America, the taxpayers of this country paid you fourteen thousand five hundred dollars to mole?
>
> [Wemette]: I believe in this particular case they did.
>
> [Defense counsel]: And that's just from June of '93 to present, isn't it?
>
> [Wemette]: That's what I was trying to say, yes.
>
> [Defense counsel]: In terms of your career as a mole, you've done quite well, haven't you?
>
> * * *
>
> [Wemette]: I used all that money in expense money. I made no profit or gain on it."

At the defendant's second trial, defense counsel again attempted to elicit from Wemette testimony as to how much money he received in connection with the defendant's case. However, defense counsel was unable to elicit the same testimony as he did at the defendant's first trial. The relevant portion of Wemette's cross-examination at the second trial is as follows:

> "[Defense counsel]: Well, did—at some point they offered to pay you money for your story, isn't that true?
>
> [Wemette]: No, sir.
>
> [Defense counsel]: Were you paid fourteen thousand five hundred dollars for this story?
>
> [Wemette]: Paid for a story, sir?
>
> [Defense counsel]: Were you paid for this information by the federal government?
>
> [Wemette]: I don't believe I was paid for the information. They

gave me expense money for phone calls and different things that I did.

\* \* \*

[Defense counsel]: Mr. Wemette, are you denying that you were paid a bounty for this information?

[Wemette]: A bounty?

[Defense counsel]: Are you denying that you were paid fourteen thousand five hundred dollars for this information?

[Wemette]: Yes. Nobody paid me money for information. They reimbursed me—I signed vouchers for expenses that I had.

[Defense counsel]: It's your testimony that you were only paid expense money on this case?

[Wemette]: No, I believe there was a reward afterwards. They told me afterwards, they said you have a reward coming. They gave me—I don't remember how much it was.

[Defense counsel]: Was it fourteen thousand five hundred dollars?

[Wemette]: No.

[Defense counsel]: What was it approximately?

[Wemette]: I don't recall but it wasn't—maybe—I don't know.

[Defense counsel]: Was it more that ten thousand?

[Wemette]: No.

[Defense counsel]: Was it more than five thousand?

[Wemette]: I don't know—I don't think so.

[Defense counsel]: But you were paid a reward?

[Wemette]: Yes, sir."

Defense counsel then attempted to impeach Wemette with his prior testimony as to being paid $14,500. The State, however, objected on the ground that the testimony was not impeaching. The court sustained the State's objection. Defense counsel again asked Wemette whether he was paid $14,500 in the defendant's case. The State objected to the question on the basis that it was asked and answered, and the court sustained the objection. At a later point during cross-examination, defense counsel questioned Wemette further about his role as a government informant. Wemette admitted that he was reimbursed in cash for providing information and stated that he "would sign a receipt that said for cigarettes, cab fare, food, whatever" in exchange for the information. Following Wemette's testimony, defense counsel filed a motion to require the State to correct his testimony regarding his compensation in this case. The circuit court denied the motion.

The defendant now argues that, "[d]ue to Wemette's evasiveness, the State's objections [to defense counsel's questions], and the trial

court's rulings, the jury failed to learn that Wemette had received the substantial sum of $14,500 from the government in connection with the case." He maintains that, whenever Wemette was asked about the $14,500, he answered in the negative, leaving the jury with the mistaken impression that he had only been compensated for incidental expenses, and had possibly received an unspecified reward after the first trial which would not have included the original $14,500 he had received. We disagree.

During the defendant's first trial, Wemette admitted receiving $14,500 as expense money in the defendant's case when specifically asked if the government paid him this amount as a "mole." Looking closely at Wemette's cross-examination during the second trial, however, it is clear that defense counsel did not ask the same questions that he asked at the defendant's first trial. At the second trial, defense counsel asked Wemette if he was paid $14,500 "for this story" and if he was paid "a bounty for this information." Wemette's respective responses, "Paid for a story, sir?" and "A bounty?" indicate that his denial was not to the amount of money he was being compensated for, but to the reason why he was compensated. When defense counsel asked Wemette if he was denying that he was paid $14,500 "for this information," he responded, "Yes. Nobody paid me money for information. They reimbursed me—I signed vouchers for expenses that I had." When viewed in its entirety, it is clear that Wemette did not deny receiving $14,500 in the defendant's case. He merely answered that he received money for his expenses in the case, as he made clear during the first trial. The fact that defense counsel attempted to ask the questions by getting Wemette to concede that he was paid a "bounty" or paid for a "story" did not impose an obligation on the State to elicit from Wemette an answer to defense counsel's satisfaction.

The defendant further argues that, even if Wemette did not commit actual perjury, the State nonetheless allowed the jury to be misled by his testimony. See *People v. Perkins*, 292 Ill. App. 3d 624, 686 N.E.2d 663 (1997) (even if testimony is "technically truthful," the ultimate question is whether the jury was misled by the nature of the testimony). He maintains that, instead of rectifying Wemette's testimony, the State objected to defense counsel's questioning which "entirely frustrated defense counsel's final effort to elicit the truth from Wemette." The State first objected to defense counsel's attempt to impeach Wemette with his prior testimony that he had received $14,500 on the basis that it was not impeaching. We find no error in the court's ruling, as Wemette had stated that he was paid a reward, but did not remember the exact amount. The State also objected when defense counsel again asked Wemette if he was paid this amount in

the defendant's case on the ground that the question was asked and answered. This ruling was also correct because defense counsel had previously asked this question and received an answer. Accordingly, we find no error in this regard.

Moreover, even if we concluded that the State failed to correct Wemette's testimony and the circuit court erred in sustaining the State's objections as to defense counsel's line of questioning, we do not believe there is a reasonable likelihood that Wemette's testimony as to the specific monetary amount could have affected the verdict. The jury had sufficient information before it to adequately assess the credibility and reliability of Wemette's testimony. It heard that Wemette was a government informant from 1970 to 1989, that he was reimbursed in exchange for information in the defendant's case, and that he was paid a reward for this information. We find that the jury was made well aware that Wemette had received monetary compensation for the information he gave in the defendant's case and, therefore, find that Wemette's failure to specify that it was $14,500 did not contribute to the jury's verdict. See *People v. Williams*, 332 Ill. App. 3d 254, 773 N.E.2d 143 (2002) (court held that witness's uncorrected false testimony did not contribute to jury's verdict where jury was made aware that the witness ultimately benefitted from his cooperation with the authorities by receiving a reduced sentence and, therefore, had sufficient information before it to assess credibility and reliability of the witness's testimony); see also *People v. Thurman*, 337 Ill. App. 3d 1029, 787 N.E.2d 263 (2003) (court held that witness's uncorrected testimony did not affect the outcome of the case).

For these reasons, we conclude that the defendant was not deprived of due process by Wemette's testimony relating to the compensation he received for testifying in the defendant's case.

■ As his final assignment of error, the defendant contends that the circuit court erred in allowing his close friend, Joseph Plemmons, to testify that the reason he came forward with damaging evidence against the defendant was that he found out that the defendant had lied about how his wife, Beverly Hansen, died. According to the defendant, the jury could have inferred from Plemmons' testimony that the defendant had murdered his wife and then lied about it and, therefore, the prejudicial impact of allowing him to testify in this manner far outweighed its probative value.

Evidence is admissible if it is relevant to an issue in dispute and its probative value is not substantially outweighed by its prejudicial effect. *People v. Patterson*, 192 Ill. 2d 93, 114-15, 735 N.E.2d 616 (2000). A circuit court's determination as to whether evidence is relevant and admissible will not be reversed absent a clear abuse of discretion

resulting in prejudice to a defendant. *People v. Morgan*, 197 Ill. 2d 404, 455, 758 N.E.2d 813 (2001).

The record shows that, prior to Plemmons' testimony, defense counsel argued that Plemmons should not be allowed to testify that the reason that he decided to testify against the defendant was because he found out that the defendant had lied about how his wife died. Defense counsel claimed that the jury would infer that the defendant was responsible for her death when, in fact, she actually committed suicide. The trial judge disagreed, stating that Plemmons' reason for finally testifying against the defendant related to a lie he was told and did not lead to a natural inference that the defendant had killed his own wife. The court clarified that the State would not be allowed to mention the suicide, unless defense counsel "open[ed] the door" into this matter.

Plemmons testified as to three conversations in which the defendant implicated himself in the murders. Plemmons stated that he finally came forward with the information in November 1994 because he believed that the defendant had lied to him about "what happened to his wife Beverly." Following Plemmons' testimony, the State rested and defense counsel moved for a mistrial on the basis that Plemmons' testimony created an inference that the defendant was responsible for his wife's death. The circuit court rejected defense counsel's argument and denied the motion. Near the conclusion of the defendant's case, defense counsel sought to introduce Beverly's death certificate into evidence to refute the alleged inference raised by Plemmons. The circuit court refused to allow the death certificate into evidence, stating that "suicide is very prejudicial because that could be the inference [*sic*] *** maybe she killed herself because she thought [the defendant] killed three little boys, maybe she killed herself because she found out that [the defendant] was having sexual relationships with young boys." In an effort to allay defense counsel's concerns regarding any inference created by Plemmons' testimony, the trial judge offered to tender a limiting instruction apprising the jury that Plemmons' testimony as to why he testified was received for the limited purpose of establishing his state of mind. Defense counsel, however, refused the jury instruction.

The defendant argues that Plemmons' testimony regarding his motive for testifying against the defendant should be considered "in the same light as any other evidence of a collateral crime committed by an accused," or what is referred to as "other crimes evidence." We disagree. We do not believe that Plemmons' testimony created any reasonable inference that the defendant had killed his wife. Plemmons' testimony that he finally came forward with the information

because he believed that the defendant had lied to him about "what happened to his wife Beverly" could have raised a number of inferences, the least logical of which is that the defendant was somehow responsible for her death. Based on our finding that Plemmons' testimony did not create a natural inference that the defendant had killed his wife, there is no evidence of a collateral crime at issue. See *People v. Huffman*, 177 Ill. App. 3d 713, 532 N.E.2d 556 (1988). We also reject the defendant's contention that "[i]t was entirely unnecessary for the State to elicit testimony regarding Beverly's death in explaining why Plemmons waited so long to tell his story." Defense counsel stated in his opening argument that Plemmons' motivation for testifying was to "get the deal that he wanted" from the government with respect to a pending fraud charge. As the circuit court correctly noted, the State should have been permitted to elicit from Plemmons that he had a different motivation for finally testifying against the defendant. We also find no error in the circuit court's refusal to admit the death certificate into evidence. As the court explained, the admission of the death certificate would have been extremely prejudicial to the defendant. Finally, we note that the circuit court offered to give a limiting instruction to the jury to alleviate defense counsel's concerns with respect to Plemmons' testimony, but defense counsel declined the instruction.

Accordingly, we conclude that the circuit court did not abuse its discretion in allowing Plemmons to testify as to his motivation for coming forward to testify against the defendant and for refusing to admit Beverly Hansen's death certificate into evidence.

For the foregoing reasons, the defendant's convictions and sentences are affirmed.

Affirmed.

SOUTH and KARNEZIS, JJ., concur.