2020 IL App (2d) 180887
No. 2-18-0887
Opinion filed December 30, 2020

_____

IN THE

APPELLATE COURT OF ILLINOIS

SECOND DISTRICT
_____

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) ) ) | Appeal from the Circuit Court of Winnebago County. |
| Plaintiff-Appellee, | ) ) | |
| v. | ) ) | No. 13-CF-1611 |
| | ) ) | Honorable |
| LORENZO KENT JR., | ) ) | Joseph W. McGraw and Fernando L. Engelsma, |
| Defendant-Appellant. | ) | Judges, Presiding. |

_____

JUSTICE BRENNAN delivered the judgment of the court, with opinion.
Justices McLaren and Jorgensen concurred in the judgment and opinion.

**OPINION**

¶ 1    Defendant, Lorenzo Kent Jr., appeals his conviction of first-degree murder. He challenges

the sufficiency of the evidence, the admission of a witness's prior testimony and identification

evidence, and the admission of two .22-caliber cartridges recovered during the search of the

apartment in which defendant was arrested two days after the murder. Defendant also raises

ineffective-assistance-of-counsel claims. For the following reasons, we reverse and remand.

¶ 2                              I. BACKGROUND

¶ 3    On the evening of May 6, 2013, Donmarquis Jackson was shot and killed in the driveway

of 1428 Nelson Boulevard in Rockford. Defendant was convicted of the first-degree murder of

Donmarquis (see 720 ILCS 5/9-1(a)(1) (West 2012)) and received an extended-term sentence of 55 years' imprisonment for personally discharging the weapon (see 730 ILCS 5/5-8-1(a)(1)(d)(iii) (West 2012)). On direct appeal, we reversed the conviction and remanded the cause for a new trial, based upon the improper admission of Facebook evidence. *People v. Kent*, 2017 IL App (2d) 140917.

¶ 4                                    A. Postremand Pretrial Proceedings

¶ 5     The parties returned to the trial court. On September 6, 2017, a jury trial date was set for November 13, 2017. The parties appeared for status hearings on September 25, 2017, and October 2, 2017. At the final pretrial conference, on November 1, 2017, the parties informed the trial court that they would be filing several motions *in limine*. The State further advised that "a couple of [the motions *in limine*] will have to do with unavailable witnesses and prior admission of transcripts from prior testimony" and that "[w]e're still, obviously, searching for witnesses and we'll keep searching for them." Relevant to this appeal are the parties' motions *in limine* with respect to witness Wesley Johnson III and defendant's motion *in limine* from the first trial to exclude two .22-caliber cartridges recovered during the search of the apartment in which defendant was arrested two days after the murder.

¶ 6               1. *State's Motion* in Limine *to Admit Wesley's Prior Testimony*

¶ 7     As discussed in further detail below, Wesley was 13 years old on the date of the murder, lived a couple of blocks from 1428 Nelson Boulevard, and testified at the first trial that he witnessed the shooting and saw the shooter at the park earlier that evening. The State filed a motion *in limine* seeking a determination that Wesley was an unavailable witness pursuant to Illinois Rule of Evidence 804(a)(5) (eff. Jan. 1, 2011) and the admission of his testimony from the first trial as an exception to the hearsay rule pursuant to Illinois Rule of Evidence 804(b)(1) (eff. Jan. 1, 2011)

(State's motion *in limine* number 25). In its motion, the State argued: "The People have been unable to locate Wesley Johnson III as of November 6, 2017, despite numerous attempts to do so. That investigators have been able to contact the family of Wesley Johnson III who is uncooperative and refuse[s] to reveal his location."

¶ 8    At the November 6, 2017, hearing on the parties' motions *in limine*, the State argued in support of State's motion *in limine* number 25:

"Again, I feel just maybe a little bit premature because the State is trying to get [Wesley] served.

What I can proffer is that the investigators have made contact with the family of [Wesley] more than once [and] that his father Wesley Johnson, II has been very hostile. They have avoided any, I guess, attempts of service for [Wesley]. They have refused to inform our investigators of where he is; however, we have information or reason to believe that [Wesley] does tend to be with the family. We just aren't able to get the family to cooperate. There's been attempts at service where we know people are in the house but they won't answer the door. It has not been just one time[,] it's been more than once. We are still trying.

I have not done things that I had typically to show unavailability like calling the coroner's office and hospitals because it's clear, at least to my investigators and to the State, that this is simply a situation of somebody not wanting to be physically able to be served with a subpoena.

[Wesley] was at the prior trial. He did testify. He was cross[-]examined extensively. I believe that by the time the case goes to trial, if the State still hasn't been able to serve [Wesley], that we will definitely have been able to show that we have been duly diligent at

trying to get him served and that his prior testimony, through transcripts, should be admitted. And that would be under 804(a)(5)."

¶ 9    Defense counsel argued in opposition that "[i]t doesn't appear as though it is unknown where [Wesley] is." Rather, "[i]t appears as though they have reason to believe about his whereabouts but just have not been able to physically serve him with the subpoena." Moreover, defense counsel noted, Wesley "was really the only eyewitness to the actual shooting." The State nevertheless argued that Rule 804(a)(5) does not require lack of knowledge as to the witness's location.

¶ 10    The trial court initially stated: "You've tried to get him through his father, he's been uncooperative. I would say at this time you have used reasonable efforts to get him and will continue to do so." The trial court noted that Wesley was the only eyewitness at the first trial but that Rule 804(a)(5) "would indicate that [his testimony] would come in" in light of the "reasonable efforts to try and secure his presence." The State responded: "I don't know if your Honor will just go with the proffer of the State or if you wanted testimony or an affidavit from our investigators showing what they tried to do. But we'll continue trying to secure him for trial." Accordingly, the trial court concluded: "[I]t's passed. But continued efforts will be made to secure his in-person presence." The State responded: "Correct." After further argument, the trial court reiterated that "[a]t this point I'm passing ruling" on the motion *in limine* but that the prior testimony "would be admissible under these limited circumstances." The trial court's November 6, 2017, written order stated that the State's motion *in limine* number 25 was heard and that the ruling was reserved.

¶ 11    At a status hearing the next day, on November 7, 2017, the trial court noted that it had reserved ruling on State's motion *in limine* number 25. However, in response to defense counsel's

statement that she thought that the motion had been granted, the trial court agreed, stating, "I did, you're right \*\*\*."

¶ 12 The ruling on the motion was raised again at a status hearing the next day, on November 8, 2017, after the trial court granted a defense motion *in limine* that also involved the unavailability of a witness pursuant to Rule 805(a)(5). Namely, defendant sought to admit the prior testimony of Shannon Watters, who lived next door to 1428 Nelson Boulevard and testified at the first trial regarding events that she witnessed after the shooting. Defense counsel stated that Shannon had moved and counsel reported on the investigator's unsuccessful efforts to locate her. The trial court found that defendant established due diligence, that Shannon was an unavailable witness, and that her prior testimony was therefore admissible as an exception to the hearsay rule under Rule 804(b)(1).

¶ 13 Following its ruling, the trial court revisited State's motion *in limine* number 25, noting: "Now, before I can go on, I don't believe we've addressed your 25th Motion *in Limine*. I passed on that and that was because you were—it's the same as [defendant's] motion concerning the unavailable witness." The following colloquy ensued:

"MS. GADOW [(ASSISTANT STATE'S ATTORNEY)]: Oh. I thought that that was ruled on, Judge.

MS. LEE [(ASSISTANT PUBLIC DEFENDER)]: It was my understanding that had been granted.

THE COURT: Okay. My, my note on it says passed. I intended to grant it based on your representation of your attempt to locate [Wesley].

\* \* \*

THE COURT: So that's granted. Especially, especially it's not a tit for tat situation. It's standard—if the witness is unavailable—testimony by prior testimony."

¶ 14 Accordingly, the trial court granted State's motion *in limine* number 25.

¶ 15     2. *The Parties' Motions* in Limine *Regarding the Photo Array Shown to Wesley*

¶ 16 As discussed in further detail below, two days after the murder, on May 8, 2013, Wesley was shown a six-person photo array. Wesley picked out photo number one and photo number four from the array. Photo number four was a photo of defendant. Defendant filed a motion *in limine* to bar evidence regarding Wesley's "viewing of a photo lineup" and prohibit the State from eliciting any testimony that Wesley made a prior identification of defendant (defendant's motion *in limine* number 14). Defendant's position was that the evidence was hearsay and not admissible as a prior identification under section 115-12 of the Code of Criminal Procedure of 1963 (Code) (725 ILCS 5/115-12 (West 2012)).

¶ 17 Defense counsel argued at the November 6, 2017, hearing on the motions *in limine* that, "when you can't solely pick one person out of a lineup[,] that's not an identification." The trial court inquired as to whether defendant objected to the evidence at the first trial. Defense counsel stated that she did not recall; the State advised that defendant objected but that "it was allowed in because it was, it's what happened." The trial court, however, stated that "the reason a prior identification is admissible [is that] it's an exception [to the hearsay rule]" and that "I don't find it to be an [identification;] just because it is what happened doesn't get it in." The trial court concluded, "I'm not going to allow the near identification I guess." The trial court's November 6, 2017, written order following the hearing stated that defendant's motion *in limine* number 14 was heard and granted.

¶ 18    Nevertheless, the State subsequently filed a motion *in limine* to admit evidence regarding the photo array and Wesley's selection of defendant's photo pursuant to section 115-12 and Illinois Rule of Evidence 801(d)(1)(B) (eff. Oct. 15, 2015) (State's motion *in limine* number 23). The State's position was that "[p]rior identification evidence that is excluded from hearsay includes the entire lineup process and nonidentification evidence."

¶ 19    On November 13, 2017, prior to the start of the second trial, the trial court heard argument on State's motion *in limine* number 23. The trial court noted that the motion was related to defendant's motion *in limine* number 14 and stated that it had reserved ruling on that motion (actually, the record reflects that the court granted the motion). The State argued that the evidence was a prior statement of identification admissible under section 115-12 and Rule 801(d)(1)(B). Defense counsel, however, argued that Wesley merely "picked two people out of a lineup, said he didn't know for sure." Defense counsel argued that this was not an identification and that the evidence was "not very probative and [ ] would only to serve to prejudice [ ] defendant."

¶ 20    Following argument, the trial court found:

"[Section] 115-12 and Rule of Evidence 801 does provide for [an] out-of-court statement which would normally be hearsay as an exception if it's one of identification and the person is subject to cross-examination concerning the statement. And that's testified at trial although it's been a little bit iffy concerning whether the trial testimony has to come first or not. But it's a statement [of] identification that fits within that section and would even without an in-court identification. It's meant to be as an exception to hearsay."

The trial court reasoned that neither section 115-12 nor Rule 801 requires that the out-of-court identification "is being introduced and is relevant on the issue of corroboration of an in-court identification." Rather, the trial court reasoned, "assuming the [B]iggers factors [(the factors set

forth in *Neil v. Biggers*, 409 U.S. 188 (1972), to determine the reliability of witness identifications] are there and I find they are in this case \*\*\*," the challenged evidence is relevant and a "statement of identification even without an in-court identification." Thus, the "argument then goes to weight and not the admissibility of the prior identification." Accordingly, the trial court granted State's motion *in limine* number 23.

¶ 21        3. *Defendant's Motion* in Limine *to Exclude the .22-Caliber Cartridges*

¶ 22    Prior to the first trial, defendant filed a motion *in limine* to exclude two .22-caliber cartridges recovered during a search in one of the bedrooms of the apartment where he was arrested two days after Donmarquis's murder. The cartridges were sent to the crime lab and tested by forensic scientist Christina Davison. She compared the cartridges to the empty .22-caliber cases found at the crime scene and "found in her report that the unfired ammunition 'could not be identified or eliminated as having been made by the same tool as tool marks present on the fired cartridge cases.' " Thus, defendant argued, the cartridges found in the bedroom were not relevant, and any substantive value of the evidence was substantially outweighed by the risk of unfair prejudice to defendant. The State, however, argued that the evidence was relevant to establish defendant's access to the same caliber of ammunition that killed Donmarquis.

¶ 23    Following argument, the trial court denied defendant's motion *in limine* to exclude the cartridges. The trial court found the evidence relevant and admissible "[i]f foundationally it's established that [defendant] was in the same room as the bullets [*sic*] contemporaneous in time." On remand, at the November 1, 2017, final pretrial conference, the trial court stated that its ruling on the parties' motions *in limine* from the first trial remained extant (with the exception of the rulings that were reversed in the first appeal).

¶ 24                            B. Trial

¶ 25    We recount the evidence presented in the second trial as follows.

¶ 26    1. *Altercation Between Defendant and the Victim Two Days Before the Murder*

¶ 27    Doris Gregory, Donmarquis's girlfriend, testified that she and Donmarquis lived at her mother's house at 1428 Nelson Boulevard. On May 4, 2013, there was a physical fight between Donmarquis and defendant in front of the house. The mother of Donmarquis's children, Kimiko Wilson, was also there, but Doris testified that she did not know Kimiko's relationship to defendant. Doris did not hear defendant say anything during the fight, but she testified that defendant had a knife. Defendant and Kimiko left after Doris's mother came outside and said that she had called the police.

¶ 28    Deshon Thompson testified that on May 4, 2013, he and Donmarquis drove to the store. Donmarquis received a phone call from "his baby's mama," whose name Deshon did not know. When Deshon and Donmarquis returned home, Donmarquis was confronted by "his baby's mama and her boyfriend, whom Deshon did not know. Deshon identified defendant in court as the "boyfriend." When they pulled up to the house, Donmarquis's "baby's mama" was coming out of the house, and other people were on the porch. Donmarquis and defendant exited their cars. They argued and physically fought on the porch for about 10 minutes. Deshon testified that Donmarquis's "baby's mama" was "egging" defendant on during the fight. Defendant pulled out a knife and said, "[B]itch, I'm going to kill you." Donmarquis tried to get away. At that point, Deshon testified, someone called the police, and defendant and "his girlfriend" drove away. Deshon testified that he did not intervene in the fight although Donmarquis called his name.

¶ 29    Deshon spoke to the police a month after the altercation. On cross-examination, Deshon acknowledged differences between his current testimony and prior testimony. Specifically, he had previously testified that defendant and his girlfriend arrived at the house five minutes after he and

Donmarquis arrived, that no other people were on the front porch at the time of the fight, that defendant and "the baby's mama" did not communicate during the fight, and that Deshon helped to break up the fight.

¶ 30    Rockford police officer Mark Petrucci testified that on May 4, 2013, around 5 p.m., he was dispatched to 1428 Nelson Boulevard for a report of a battery. When he arrived, he spoke with Donmarquis. Donmarquis had injuries on his forehead, face, knee, and elbow but did not require medical attention. Officer Petrucci called the Department of Children and Family Services (DCFS) because Donmarquis's son was present during the incident.

¶ 31    DCFS caseworker Aimee Jerding testified that on May 5, 2013, she went to Kimiko's apartment to discuss the incident. After further investigation, DCFS took protective custody of Kimiko and Donmarquis's two children. Defendant was not present when the children were removed from Kimiko's custody.

¶ 32        2. *Defendant's Interactions With Three Teenagers on the Day of the Murder*

¶ 33                                    a. Genesis Burrell

¶ 34    Genesis testified that she was 14 years old on the date of the murder. On May 5, 2013—the day before the murder—she argued with her mother and spent the night at the home of her friend, Mikayla Allen. The next morning, when Mikayla went to school, Genesis went to Blackhawk Park and fell asleep there. Genesis testified that someone she did not know woke her. She described the person as light skinned, short, and with braids. The person told Genesis that his name was Luckii, and Genesis identified defendant in court as the person who woke her. Genesis testified that defendant told her that "his kids had gotten taken" and asked her if she "knew someone named Don because that's who guys [*sic*] gets taken." Defendant asked Genesis to walk with him past "Don's" house because "that's where [defendant's] kids were at." Genesis did not

know "Don" but agreed to walk with defendant. Defendant told Genesis that he wanted to see "Don" because "he got his kids taken." Defendant did not offer anything to Genesis to walk with him.

¶ 35    Genesis walked with defendant from Blackhawk Park down Nelson Boulevard. Defendant pointed out "Don's" house, which was down the street from her friend Wesley's house. While they were walking past the house, defendant asked for Genesis's jacket, which he put over his head when they passed the house. Genesis did not see anyone when they walked past the house. After they walked past the house, defendant told Genesis that he wanted to see "Don" because he wanted to kill him.

¶ 36    Genesis and defendant walked back to the "projects" near Blackhawk Park and got into a truck with a man and woman she did not know. Genesis testified that, when they were inside the truck, defendant told the man and woman "[j]ust basically the same thing he told me. Like this dude got my kids taken and basically it's over. I'm going to kill him." The woman made a phone call while they were inside the truck. Genesis testified that she was scared.

¶ 37    They drove to a nearby gas station. At the gas station, defendant took a gun out of a "book bag" and said that there was "Vaseline" on the "bullets" and that "he wasn't going to miss." Defendant opened up the gun and showed her that there was "Vaseline" on the "bullets." Genesis saw extra "bullets" in a sandwich bag that defendant had taken out of the book bag. Genesis testified that, while at the gas station, she did not get out of the truck because she was scared, young, and had not previously seen a gun.

¶ 38    After about five minutes at the gas station, they drove back to Blackhawk Park; defendant and Genesis exited the truck and the other two people drove away. Genesis testified that she and defendant sat in the park until she told defendant that she needed to "go get [her] friend [Mikayla]

off the bus." Defendant followed Genesis as she walked to meet Mikayla at the bus. During the walk, defendant repeated that he "got [his] kids taken." Defendant also wanted Genesis to obtain a phone. Genesis told him that she did not have a phone but that Mikayla had a phone. They met Mikayla at the bus at around 1 p.m., as it was a half day of school. Defendant asked Mikayla if he could use her phone, but the phone was not charged. The three went to Blackhawk Park where Mikayla charged her phone. Genesis testified that Mikayla pretended to call a phone number that defendant gave Mikayla "to see if he would answer." After that, defendant told Genesis "to call back and get the dude and bring him to the park so that he could kill him" but, she continued, "instead we were scared so we just went our separate ways." Defendant wanted Genesis to "get him back to the park" by calling him and acting "like I was a hot girl or something so he can, like come meet me, come hang out with me at the park." Genesis testified that she told defendant that she and Mikayla would go call the number and get "him" to the park. But they never did and went to Mikayla's house instead. Genesis testified that she never spoke with anyone she thought was "Don." Genesis remained at Mikayla's house from about 1 p.m. or 2 p.m. to about 3 p.m. or 4 p.m., when Mikayla's grandmother returned home from work and drove Genesis to Wesley's house.

¶ 39    Genesis testified that she saw defendant again that day at Blackhawk Park "[a]fter like a couple of hours" when she, Wesley, and Wesley's sister went to Blackhawk Park. They were on the ground level of a three-level "maze thing," and defendant "was standing, like, looking down at [them]." Genesis testified that defendant appeared to have showered and changed clothes and was wearing all red. He had on "a do-rag or like a hat or something" and "still had the bag." Genesis testified that defendant "looked down" and said, "I guess it didn't go through, huh." After that, Genesis told her friends that she did not feel comfortable and wanted to leave. Genesis,

Wesley, and Wesley's sister left the park and walked toward Nelson Boulevard; they did not pass Donmarquis's house on the way. Defendant also left the park and walked toward Nelson Boulevard but took a different route. Genesis testified that she did not see defendant again.

¶ 40    Genesis, Wesley, and Wesley's sister returned to Wesley's house. Genesis testified that, when they arrived, Wesley's father was cooking dinner. While eating dinner, they heard gunshots and police sirens. Genesis testified that she was scared and stayed in the house. After that, she spoke to Wesley and then went to Mikayla's house, where she stayed overnight. However, on cross-examination, Genesis testified: "What happened was we went back—Mikayla's mom dropped me off and when I got there and [*sic*] I ate dinner. And what we normally do is go to Blackhawk Park. And when we came back later that night I heard the shots." Genesis testified that she was in Wesley's house when she heard the gunshots and that Wesley was there when she heard the gunshots.

¶ 41    The next morning, on May 7, 2013, the police picked up Genesis because Genesis's mother had reported her as a runaway. Genesis testified that, while in the squad car, she spoke to Rockford police officer Keehnan Davis about "running away" and that he told Genesis that he had seen her in the area. Both Genesis and Officer Davis testified that, while they were in the squad car, Officer Davis brought up the shooting, although their testimony regarding the content of their conversation diverged. Genesis testified that in the squad car she told Officer Davis "slightly" about what happened but that she "didn't feel comfortable telling them anything in the squad car" and told Officer Davis to "take [her] to the station so [she] could tell [them] what happened." Officer Davis testified that Genesis told him that Luckii had a black star tattoo on his neck. Genesis acknowledged that she told Officer Davis that Luckii had "something on the back of his neck" but believed that she was referring to a "do-rag" and did not recall saying "tattoo." Officer Davis

testified that Genesis told him that she first met Luckii when she was at Blackhawk Park with Wesley and various other people. Genesis, however, denied that she told Officer Davis this; rather, she testified that she told Officer Davis that she was alone when she met Luckii.

¶ 42 Genesis testified that she did not know a lot about guns but described the gun as black and said that "you could take the thing out that has the bullets." She acknowledged telling Officer Davis that the gun was a ".38 Special" but said that this was after she described the gun and Officer Davis told her that the gun was a ".38 Special." Genesis explained, "Once he, once I described the gun, I then told them that the gun that he was talking about was the gun that I was talking about [*sic*] was a .38 Special."

¶ 43 Genesis went to the police station and gave a written statement. She was also shown a photo array. She recognized a photo of "Luckii" and circled and initialed the photo. Genesis testified that she did not remember whether Luckii had any tattoos. She also affirmatively testified that Luckii "did not have a star tattoo on his neck." However, when confronted with her written statement, Genesis acknowledged that she had told the police that "Luckii also had a tattoo on his neck. It was an all-black star."

¶ 44 On cross-examination, Genesis acknowledged that she testified about certain information that was not included in her written statement to the police. Namely, her written statement did not include that Luckii told Genesis to bring "Don" back to the park when she, Mikayla, and Luckii were at Blackhawk Park. However, Genesis testified that she told the police that information. Her written statement also did not include that Luckii said, "I guess it didn't go through," when she, Wesley, and Wesley's sister were on the "maze thing" at the park. Nevertheless, Genesis testified that "[i]t was a lot that day" and that the statement was not all-encompassing. She also testified

that, at the time she gave the written statement, she was 14 years old, had never been part of a murder investigation, and was scared.

¶ 45 Genesis was further questioned about the book bag that Luckii carried and the gun he showed her. Genesis testified that she remembered the colors of the book bag but was not sure if the book bag had a picture of "Dora the Explorer" on it. She testified that, when police officers came to her house a few days or a week later and showed her a book bag, it was not the book bag that Luckii had with him when they were together.

¶ 46                                    b. Mikayla

¶ 47 Mikayla, who was 14 years old at the time of the shooting, testified that in May 2013 she met her friend Genesis and a man named Luckii at her school bus stop. Mikayla did not know the man prior to that date, he never spoke to her, and she learned his name from Genesis. Mikayla identified defendant in court as Luckii.

¶ 48 Mikayla further testified that Genesis and defendant were sitting at the bus stop when she arrived. Genesis asked to use Mikayla's phone. After Mikayla gave her phone to Genesis, Genesis gave it to defendant and he called someone from the phone. Mikayla saw him dial a number and speak into the phone. Defendant then gave the phone to Genesis, and Genesis gave it back to Mikayla. A text message came through, and Mikayla gave her phone back to Genesis. Genesis, in turn, gave the phone to defendant. A number was dialed, but Genesis spoke this time. Mikayla could not hear whether the call was answered.

¶ 49 Afterward, they all went to Blackhawk Park. At the park, Mikayla charged her phone, and Genesis told her "what was going on." Genesis said that defendant "wanted to kill somebody *** over some kids or something." Mikayla testified that defendant "wasn't that far away" while they were talking; he was nodding and close enough to hear what Genesis was talking about. However,

Mikayla acknowledged her prior testimony that defendant was not near them while they were talking about him. Also, Matthew Weber (Investigator Weber), an investigator from the public defender's office, testified that he spoke with Mikayla and she did not mention that defendant nodded while Genesis talked to her. Mikayla further testified that defendant was carrying a book bag, but she did not remember what defendant was wearing or anything about his hair. Mikayla never saw a gun or ammunition.

¶ 50    Mikayla testified that she and Genesis eventually left the park, went to a friend's house (who was not home), went to another park, and arrived at Mikayla's house at around 5 p.m. or 6 p.m. After about five minutes however, her grandmother drove Genesis somewhere else. Genesis returned to Mikayla's house at around 9 p.m. and spent the night there. Mikayla did not speak to the police the next morning when they picked up Genesis.

¶ 51    Two days after meeting defendant, on May 8, 2013, Mikayla identified defendant in a photo array. The police also showed her a photo of a backpack, and she identified it as defendant's backpack. At trial, however, she could not remember if the backpack in the photo was defendant's backpack but she said that "[i]t's probably the backpack." Mikayla testified that she did not tell anyone what was going on that day, because she "wasn't really sure what was going on [her]self." She testified that she was "[a] little" scared that day and that she was "scared now."

¶ 52                                c. Wesley

¶ 53    The jury was read the transcript of Wesley's prior testimony, which included the following. Wesley lived a couple of blocks away from 1428 Nelson Boulevard. On the evening of the murder, Wesley was at basketball practice at the Blackhawk Boys and Girls Club. After the club closed, at around 7:45 p.m., he walked with Genesis, his sister, and his nephew to Blackhawk Park. There, he saw a man standing on a "balcony" and "leaning over and looking at Genesis." Wesley testified

that the man was black, was wearing all black and a black "hoodie," and was carrying a red backpack. Wesley never saw Genesis talk to the man, although Wesley spoke to Genesis about the man.

¶ 54    Genesis left the park to go to Wesley's house, and the man left sometime later. Around 8:30 p.m., Wesley left the park and went to his house, where he, his nephew, and his friend obtained bicycles and started riding around the neighborhood. The chain fell off Wesley's bicycle, so Wesley used his feet to push it down Nelson Boulevard. He saw some people on the enclosed porch across the street at 1428 Nelson Boulevard. Wesley testified that it was dark outside, but he could still see. He also testified that there was a streetlight by him. Wesley testified that a light-skinned black male left the porch and "went around the back" on the right side of the house. Then, "the same dude that I seen at Blackhawk Park he was, he came around and he shot the dude three or four times."

¶ 55    Wesley explained that the same man he had seen on the balcony at the park came from an alley behind 1428 Nelson Boulevard. The man had a black "hoodie" and a red backpack. The man "hopped" over a small gate connected to a garage. He held a black gun that Wesley thought was a .45 caliber. After hopping the fence, the man was "sliding" on the side of the house. He grabbed his backpack and loaded the gun. He fired three or four shots at the man who had left the porch. The man who was shot "tried to turn around but he fell" to the ground near the gas meter. The shooter turned around, put the gun in his book bag, and ran back the way he came. Wesley went back to his house; his father, sister, and Genesis were there. He heard squad cars but was scared and did not talk to the police that night.

¶ 56    However, two days after the shooting, on May 8, 2013, Wesley gave a written statement to the police and was shown a six-person photo array. Rockford police Sergeant Ty Eagleson testified

that he showed Wesley the photo array and that Wesley said that the shooter was either photo number one or photo number four. Photo number four was a photo of defendant. Sergeant Eagleson testified that he did not have Wesley circle, initial, or date the two photos, because it was not a positive identification. Wesley was not asked to identify defendant in court.

¶ 57                                    3. *The Shooting*

¶ 58     Denise Gregory testified that on May 6, 2013, she was at her mother's house at 1428 Nelson Boulevard. Her sister Doris and Doris's boyfriend "Donny" lived there too. Just before the shooting, she was on the front porch with a family friend, and "Donny" was sitting on the steps. "Donny" answered a phone call, left the steps, walked to the driveway by the side of the house, and then headed toward the back of the house. Denise heard five or six gunshots and ran in the house. A man she did not know came in the house behind her. Denise testified that she did not see anyone walking by the front of the house at the time of the shooting.

¶ 59     Denise's daughter, Dezirae Gregory, testified that 10 minutes before the shooting on May 6, 2013, she was with her mother, a family friend, and "Donny" on the front porch of 1428 Nelson Boulevard. Dezirae was 16 years old at the time. "Donny" answered a phone call and walked to the back porch. At that point, Dezirae went to the driveway and was "skipping or dancing" in the middle of the driveway when she heard five to six gunshots. She ran into the house. A man whom she did not recognize also came into the house. Dezirae testified that she later told police officers to look for drugs by the garage where "Donny" had been standing.

¶ 60     Courtney Gregory, the sister of Denise and Doris, testified that she also lived at 1428 Nelson Boulevard. On May 6, 2013, just prior to the murder, she put her daughter to bed in the back room of the house. The room overlooks the driveway and backyard. She heard five or six gunshots that sounded very close, but she did not see the shooter. She did not hear any argument

or commotion prior to the gunshots. Minutes later, she went out the front door onto the porch. She saw "Donny" on the ground; he was still moving. As soon as she turned the corner from the porch, she went back inside.

¶ 61    Doris testified that on May 6, 2013, she was at 1428 Nelson Boulevard with Donmarquis and her family. At 9 p.m., she was in the basement and Donmarquis was in the backyard. She heard gunshots coming from the back of the house; she did not hear any argument prior to the gunshots. As Doris ran upstairs, she saw a man run in the back door. Doris "was familiar with his face" but "didn't see him too often." Doris ran out of the house through the front door. She saw Donmarquis in the middle of the driveway. He was awake, coughing up blood, and trying to move. Doris called the police; the police arrived "pretty quickly." Doris testified that Donmarquis had two cell phones. Doris testified that it was "pitch dark" outside when the shooting occurred.

¶ 62    The prior testimony of Shannon Watters was admitted into evidence. Shannon testified that she lived next door to 1428 Nelson Boulevard at the time of the shooting. On the evening of May 6, 2013, she heard gunfire. When the shooting stopped, she looked out her window and saw someone lying on the ground. Shannon called 911; while talking to the operator, she saw two men search the pockets of the person on the ground. Shannon further testified that she had noticed a lot of traffic in and out of 1428 Nelson Boulevard but that the traffic decreased "a little bit" after the day of the shooting.

¶ 63    Teresa Golden lived nearby, on the third floor of a house at 413 Orange Street in Rockford. She testified that at 9:15 p.m. on May 6, 2013, she heard gunshots and looked out her window. She saw someone walking past her house "[k]ind of fast" with a "backpack on." She testified that she could not tell whether the person was male or female, whether the person was black or white,

or anything about the person's clothing. She lost sight of the person when the person "turned down [an] alley."

¶ 64    Rockford police officer Nicholas Weber (Officer Weber) testified that at around 9 p.m. on May 6, 2013, he was dispatched to 1428 Nelson Boulevard for a shooting. He arrived within approximately five minutes and was the first police officer at the scene. He described the house as a single-family home with a detached garage behind it. When Officer Weber arrived, he found a man lying face down in the driveway with blood near his head and under his body. He appeared to have been shot in the back. It was "pretty dark," although there was a streetlight "a little bit further down the street *** not directly in front of the house." Only the front part of the driveway near the street was lit; the garage at the far end of the driveway was not illuminated. Officer Weber walked into the backyard, which was completely unlit, to check for additional victims or suspects. As Officer Weber walked down the driveway, the house blocked his view of the backyard. From the street, it was "impossible" to see the backyard because of the layout of the house and the lighting conditions.

¶ 65    The detectives who processed the crime scene testified that they found three empty .22-caliber cases in the backyard and between the back porch and the garage and that they found two damaged cell phones. They also photographed and videotaped the crime scene. The parties stipulated to testimony from an expert in forensic biology that one of the cell phones found at the scene contained a DNA profile from which neither defendant nor Donmarquis could be excluded. The detectives who processed the crime scene also found a scale on the side of the garage and "19 individually packaged bags of a small, off-white substance we believed to be narcotics" in a fake sprinkler head in the backyard.

¶ 66    Investigator Weber testified that he subsequently took pictures of 1428 Nelson Boulevard while standing across the street. From this position, he could not see the backyard, the gate, or the alley behind the house.

¶ 67                        4. *Cartridges Recovered From Kimiko's Apartment*

¶ 68    Detective Scot Mastroianna testified that on May 8, 2013 (two days after the shooting and four days after the altercation between defendant and Donmarquis), he and Detective Joseph Stevens went to Kimiko's apartment with a warrant for her arrest based on her involvement in the altercation. Kimiko answered the door and consented to a search of the apartment. Five other people, including defendant, were there. Detective Mastroianna did not see where defendant was in the apartment. Inside the back bedroom, Detective Mastroianna found two .22-caliber cartridges—one cartridge on top of a bed and one underneath the bed. He also found an empty backpack in the other bedroom. No gun was found in the apartment.

¶ 69    Detective Stevens testified that he saw defendant exit the back bedroom where the two .22-caliber cartridges were found, although several detectives were in front of him as they walked into the apartment. Detective Stevens acknowledged that .22-caliber ammunition was a common caliber size. He pointed out that one of the cartridges was manufactured by Remington and one of the cartridges was manufactured by Federal; either brand works in a .22-caliber firearm.

¶ 70                            5. *Forensic Testimony*

¶ 71    The parties stipulated to the testimony of a forensic pathologist regarding Donmarquis's abrasions and gunshot wounds stating that the cause of Donmarquis's death was a gunshot wound to the back and that there was no evidence of close-range fire. The parties also stipulated to the testimony of Rockford police detective Sergeant Walt Felton regarding the photographs taken and the bullets recovered from Donmarquis's body during the autopsy. Sergeant Felton testified that

he was familiar with handguns and that the weight of the bullets and fragments recovered were consistent with .22-caliber bullets.

¶ 72    The jury was read the transcript of forensic scientist Davison's testimony from the first trial (as she had been found to be an unavailable witness for medical reasons). She testified that the three empty .22-caliber cases found at the scene were fired from the same gun. The three bullets found in Donmarquis's body also were fired from the same gun. However, she was unable to conclude whether the unfired .22-caliber cartridges found in Kimiko's apartment were from the same source. The case stamps on the cartridges were different from the brand on the fired cases found at the scene.

¶ 73                                6. *Jury Verdict*

¶ 74    Following closing arguments, the jury found defendant guilty of first-degree murder and that he personally discharged a firearm that proximately caused Donmarquis's death.

¶ 75                          C. Posttrial Proceedings

¶ 76    Defendant filed a posttrial motion seeking an order setting aside the jury verdict or a new trial.[1] He challenged, *inter alia*, the sufficiency of the evidence and the admission of the two .22-caliber cartridges. He also challenged the admission of Wesley's prior testimony and the evidence regarding the photo array. At the hearing on the posttrial motion, regarding the issue of Wesley's unavailability under Rule 804(a)(5), defense counsel introduced a docket entry from a criminal misdemeanor case against Wesley in the circuit court of Winnebago County. The named defendant was "Wesley Johnson" rather than "Wesley Johnson III," although the State stipulated that the

_____

[1] At this point, Judge Joseph G. McGraw had replaced Judge Fernando L. Engelsma as the assigned trial court judge.

named defendant in the misdemeanor case was in fact witness Wesley in the case. The misdemeanor case was active from September 11, 2017, to October 12, 2017, when Wesley received court supervision. The November 13, 2017, trial date in this case was set on September 6, 2017. Thus, defense counsel argued, the trial court erred in finding that Wesley was an unavailable witness, as the misdemeanor case was active during the time period in which the State could have served defendant.

¶ 77    The trial court issued a written decision denying defendant's posttrial motion. With respect to the admission of Wesley's prior testimony, the trial court found: "Judge Engelsma did not err in granting the State's 25th motion *in limine* allowing evidence of the prior testimony of unavailable witness Wesley Johnson III."

¶ 78    Following a sentencing hearing, the trial court sentenced defendant to 45 years' imprisonment. Defendant timely appealed.

¶ 79                              II. ANALYSIS

¶ 80    Defendant argues that he is entitled to a reversal of his conviction because the State failed to prove him guilty beyond a reasonable doubt. Alternatively, defendant argues that he is entitled to a new trial, based upon the improper admission of Wesley's prior testimony, the improper admission of evidence regarding the photo array shown to Wesley, and the improper admission of the two .22-caliber cartridges found in Kimiko's apartment. Defendant also argues that he is entitled to a new trial because his trial counsel was ineffective for failing to impeach Genesis with prior inconsistent statements and for failing to tender the criminal pattern jury instruction regarding the substantive admissibility of prior inconsistent statements (see Illinois Pattern Jury Instructions, Criminal, No. 3.11 (approved Oct. 17, 2014)). As a final matter, defendant asserts that the cumulative effect of the errors deprived him of a fair trial. For the following reasons, we hold that,

although the evidence was sufficient to support the conviction, defendant is entitled to a new trial because the trial court committed reversible error in admitting Wesley's testimony from the first trial.

¶ 81                           A. Sufficiency of the Evidence

¶ 82     The State has the burden of proving beyond a reasonable doubt each element of an offense. *People v. Gray*, 2017 IL 120958, ¶ 35. A reviewing court faced with a challenge to the sufficiency of the evidence must determine "whether, [after] viewing the evidence in the light most favorable to the State, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." (Internal quotation marks omitted.) *Id.* The reviewing court's role is not to retry the defendant. *Id.* Rather, it is the trier of fact's responsibility to resolve conflicts in the testimony, weigh the evidence, and draw reasonable inferences from the facts. *Id.* Thus, a reviewing court will not substitute its judgment for that of the trier of fact on questions involving the weight of the evidence or the credibility of witnesses. *Id.* A criminal conviction will not be reversed unless the evidence is "so unreasonable, improbable, or unsatisfactory" that it leaves a reasonable doubt of the defendant's guilt. *Id.*

¶ 83     Defendant's conviction rested largely on the testimony of Genesis, Mikayla, and Wesley, as well as testimony regarding the underlying motive for the murder. Two days before the murder, defendant and Donmarquis were involved in an altercation during which defendant brandished a knife and threatened to kill Donmarquis. Kimiko, the mother of Donmarquis's children, was also present. Following the altercation, DCFS took protective custody of Kimiko and Donmarquis's children.

¶ 84     Genesis and Mikayla testified regarding their encounters with defendant on the day of the murder. Genesis described meeting defendant and helping him try to find "Don"—the man who,

defendant told her, "got his kids taken" and the man whom defendant said he wanted to kill. Genesis further described walking with defendant past Donmarquis's home while defendant put Genesis's jacket over his head, driving in a truck with defendant and other strangers to a gas station where defendant showed her a gun and "bullets," and introducing Mikayla to defendant. Mikayla testified regarding the interaction with defendant and said that, while the three of them were at the park, Genesis told her that defendant wanted to kill someone "over some kids or something."

¶ 85    Both Genesis and Wesley testified that they saw defendant at the park later that evening. Genesis testified that she was in Wesley's house with Wesley when they heard gunshots. Wesley, however, testified that he witnessed the shooting. According to Wesley, he left the park around 8:30 p.m., went to his house, where he, his nephew, and his friend obtained bicycles, and started riding around the neighborhood. After his bicycle chain broke, he pushed his bicycle down Nelson Boulevard. When he passed 1428 Nelson Boulevard, he saw people on the enclosed porch. It was dark outside, but there was a nearby streetlight, and he could still see. Wesley testified that, after a man left the porch and "went around back" on the right side of the house, "the same dude that I seen at Blackhawk Park he was, he came around and he shot the dude three or four times." According to Wesley, the shooter came from an alley behind 1428 Nelson Boulevard, "hopped" over a small gate connected to a garage, was "sliding" on the side of the house, grabbed his backpack and loaded the gun, and then fired three or four shots at the man who had left the porch.

¶ 86    In challenging the sufficiency of the evidence, defendant first argues that Wesley's testimony was not credible because it was physically impossible for him to have seen what he described. Defendant contends that "darkness prevented [Wesley] from seeing the garage, let alone the backyard, gate, and alley behind the house." Doris testified that it was "pitch dark" outside at the time of the shooting. Officer Weber—the first police officer on the scene—testified that it was

"pretty dark" when he arrived at around 9:05 p.m., although there was a streetlight "a little bit further down the street." But he testified that only the front part of the driveway near the street was lit; the garage at the far end of the driveway was not illuminated. Moreover, defendant emphasizes Officer Weber's testimony that it was "impossible" to see the backyard from the street because of the lighting conditions and the layout of the house. Defendant argues that the crime scene video confirms the darkness. Defendant also cites Investigator Weber's testimony that he photographed 1428 Nelson Boulevard while standing across the street and could not see the backyard, the gate, or the alley behind the house.

¶ 87    In arguing that Wesley's testimony was not credible, defendant further points out discrepancies in Wesley's trial testimony as well as discrepancies between Wesley's and Genesis's accounts of the events. For instance, while Wesley testified that he witnessed the shooting, Genesis testified that she was with Wesley at his house when the shots were fired. Also, though Wesley testified that he witnessed the shooting from across the street, Denise, who was on the front porch when the shooting occurred, testified that she did not see anyone walking by the front of the house at the time of the shooting. And Dezirae, who was on the driveway at the time of the shooting, did not mention that she saw anyone across the street.

¶ 88    However, the deficiencies defendant cites in Wesley's testimony do not necessitate reversal of the conviction. The jury was shown photographs of the crime scene taken on the night of the shooting, the crime scene video, the photographs taken by Investigator Weber, as well as a diagram of the driveway, sidewalk, and structures in the area. The evidence showed a dimly lit and narrow sightline from the sidewalk to the backyard. The jury considered Wesley's testimony in the context of that evidence. Moreover, "even contradictory testimony does not necessarily destroy the

credibility of a witness, and it is the task of the trier of fact to determine when, if at all, [the witness] testified truthfully." *Gray*, 2017 IL 120958, ¶ 47.

¶ 89 Defendant nevertheless argues that Genesis's testimony was likewise not credible and discounts Mikayla's testimony on the basis that "[e]verything Mikayla knew about this incident was based on what Genesis told her." Defendant contends that Genesis's description of the encounter with defendant was implausible, as she did not attempt to flee or alert anyone to her situation despite being scared and having chances to leave or ask for help. Moreover, Genesis remained with defendant even though defendant neither threatened her nor promised her anything. Defendant also points to contradictions in Genesis's testimony regarding whether she was alone when she met defendant, the type of gun he had shown to her, where she and Mikayla went after leaving the park, and the timing of when she ate dinner and returned to the park that evening. In addition, Genesis testified that defendant repeatedly stated that "his kids" had been taken away, but there was no evidence that defendant had children or that he considered Kimiko's children "his kids." However, the jury was in the best position to consider witness credibility, resolve any inconsistencies, and determine the weight to be afforded the testimony. We may not substitute our judgment for that of the jury on questions involving witness credibility. See *Gray*, 2017 IL 120958, ¶ 35.

¶ 90 Moreover, there was significant additional evidence of defendant's guilt. Genesis testified without contradiction to defendant's statements about wanting to kill someone named Don. Both Genesis and Mikayla identified "Luckii" in a photo array and identified defendant as "Luckii" in court. During the altercation at 1428 Nelson Boulevard two days before the murder, defendant brandished a knife and threatened to kill Donmarquis. Donmarquis was shot to death in the driveway at that address two days later. When defendant was arrested in Kimiko's apartment after

the shooting, he was seen exiting a bedroom where two .22-caliber cartridges were found on and under a bed. Detectives found three spent .22-caliber cases at the crime scene, and testimony was introduced that the weight of the bullets and the fragments recovered from Donmarquis's body were consistent with .22-caliber bullets.

¶ 91    While defendant argues that "the evidence that [Donmarquis] was dealing drugs from the house provided another plausible explanation for the murder," defendant points to no evidence introduced at trial to establish that Donmarquis was engaged in drug dealing or that the narcotics and drug paraphernalia found outside 1428 Nelson Boulevard were connected to him. Nevertheless, defense counsel advanced this alternative theory of the murder in closing argument. The jury presumably rejected this theory as evidenced by its verdict. In sum, when considering all of the evidence in the light most favorable to the prosecution, we conclude that a rational trier of fact could have found the essential elements of first-degree murder beyond a reasonable doubt.

¶ 92                          B. Admission of Wesley's Prior Testimony

¶ 93    The confrontation clause of the sixth amendment to the United States Constitution guarantees the right of an accused in a criminal prosecution to "be confronted with the witnesses against him." U.S. Const., amend. VI; *People v. Hood*, 2016 IL 118581, ¶ 19. The confrontation clause thus "prohibits the 'admission of testimonial statements of a witness who did not appear at trial unless [the witness] was unavailable to testify at trial, and the defendant had had a prior opportunity for cross-examination.' " *Hood*, 2016 IL 118581, ¶ 20 (quoting *Crawford v. Washington*, 541 U.S. 36, 53-54 (2004)).

¶ 94    In accordance with these strictures, Illinois Rule of Evidence 804(b)(1) (eff. Jan. 1, 2011) allows for the admission of former testimony of an "unavailable" witness as an exception to the hearsay rule "if the party against whom the testimony is now offered *** had an opportunity and

similar motive to develop the testimony by direct, cross, or redirect examination." The "unavailability" of a witness under the rule includes where the witness "is absent from the hearing and the proponent of a statement has been unable to procure the declarant's attendance *** by process or other reasonable means." Ill. R. Evid. 804(a)(5) (eff. Jan. 1, 2011). The proponent of the evidence has the burden of proving the necessary elements for admissibility. *People v. Torres*, 2012 IL 111302, ¶ 53.

¶ 95    There is no dispute that defendant had an opportunity and similar motive to develop Wesley's testimony at the first trial. The issue here is whether the trial court erred in determining that the State met its burden of establishing that Wesley was an unavailable witness under Rule 804(a)(5).

¶ 96                              1. *Wesley's Unavailability*

¶ 97    Our supreme court has described the "unavailability" of a witness as " 'a narrow concept, subject to a rigorous standard.' " *Torres*, 2012 IL 111302, ¶ 54 (quoting *People v. Johnson*, 118 Ill. 2d 501, 509 (1987)). The State is obliged to make a " 'good-faith effort' " to obtain the witness's presence at trial. (Emphasis omitted.) *Id.* (quoting *Ohio v. Roberts*, 448 U.S. 56, 74 (1980), *overruled on other grounds by Crawford*, 541 U.S. 36)). In defining the good-faith requirement, " 'certain general propositions safely emerge.' " *Id.* (quoting *Roberts*, 448 U.S. at 74). Namely:

> " 'The law does not require the doing of a futile act. Thus, if no possibility of procuring the witness exists (as, for example, the witness'[s] intervening death), "good faith" demands nothing of the prosecution. But if there is a possibility, albeit remote, that affirmative measures might produce the declarant, the obligation of good faith *may* demand their effectuation. "The lengths to which the prosecution must go to produce a witness *** is a

question of reasonableness." [Citation.] The ultimate question is whether the witness is unavailable despite good-faith efforts undertaken prior to trial to locate and present that witness. As with other evidentiary proponents, the prosecution bears the burden of establishing this predicate.' " (Emphasis in original.) *Id.* (quoting *Roberts*, 448 U.S. at 74-75).

Accordingly, the State "has the burden of proving that the steps it took to secure the presence of a missing witness at trial were made in good faith and were reasonable under the circumstances." *People v. Smith*, 275 Ill. App. 3d 207, 215 (1995).

¶ 98    While a defendant's sixth amendment right to confront a witness is a question of law subject to *de novo* review, a trial court's ruling on the admission of former testimony is reviewed for an abuse of discretion. See *Torres*, 2012 IL 111302, ¶¶ 46-52. A trial court abuses its discretion when its decision is arbitrary, fanciful, or unreasonable or where no reasonable person would take the court's view. *People v. Starks*, 2012 IL App (2d) 110273, ¶ 20. Here, the trial court ruled on the parties' motions *in limine* regarding whether Wesley was an unavailable witness under Rule 804(a)(5). This was an evidentiary ruling that we review for an abuse of discretion. See *id.* ("As a general rule, a trial court's ruling on a motion *in limine* regarding the introduction or exclusion of evidence is reviewed under the abuse of discretion standard."); *People v. Hansen*, 352 Ill. App. 3d 40, 48 (2004) (the trial court's ruling on whether a witness was unavailable under the former-testimony exception to the hearsay rule was reviewed for an abuse of discretion).

¶ 99    In determining whether the trial court abused its discretion in ruling that Wesley was an unavailable witness under Rule 804(a)(5), we turn to the State's proffer. At the November 6, 2017, hearing on the parties' motions *in limine*, the State represented that investigators had contact with Wesley's family "more than once," that Wesley's father was hostile, and that the family had

avoided attempts to serve Wesley. The State further represented that the family refused to disclose Wesley's location to investigators but that there was reason to believe that Wesley tended to be with the family. In referring to the family's lack of cooperation, the State explained that service had been attempted when it was known that people were in the house, but they did not answer the door. These attempts at service had "not been just one time[;] it's been more than once."

¶ 100 Preliminarily, we address defendant's argument regarding deficiencies in the form of the State's proffer. According to defendant, regardless of the substance of the proffer, the State did not meet its burden of demonstrating unavailability, because it merely proffered a summary of investigative efforts without presenting any supporting evidence.

¶ 101 Although not a requirement set forth in Rule 804, courts have held that a claim of unavailability must be "supported by affidavit or testimony." *Hansen*, 352 Ill. App. 3d at 48; *Curt Bullock Builders, Inc. v. H.S.S. Development, Inc.*, 261 Ill. App. 3d 178, 182 (1994). For instance, in *Hansen*, the defendant filed a motion to admit at trial a witness's testimony from a prior postconviction hearing on the ground that the witness was unavailable to testify in light of her mental and physical issues. 352 Ill. App. 3d at 46. In support of the motion, the defendant submitted unsworn letters from the witness's psychiatrist and treating physician regarding the witness's mental and physical condition. *Id.* at 46-47. The trial court denied the motion, finding an insufficient basis upon which to conclude that the witness was unavailable for purposes of the former-testimony exception to the hearsay rule. *Id.* The appellate court affirmed the trial court's determination that the unverified letters did not support a finding of unavailability, noting the " 'rigorous standard' " to which the concept of unavailability must be subjected. *Id.* at 47-48 (quoting *Johnson*, 118 Ill. 2d at 509).

¶ 102   The State's proffer here likewise was unsupported by affidavit or sworn testimony. Further, the State recognized that an affidavit or sworn testimony was ordinarily required, when, at the November 6, 2017, hearing on the motion *in limine*, it asked the trial court if it would "just go with the proffer of the State or if you wanted testimony or an affidavit from our investigators showing what they tried to do." The trial court never directly answered the question, and defense counsel did not object to the State proceeding by way of proffer.

¶ 103   Even if the State's proffer were sufficient in form, its substance and the record otherwise compel the conclusion that the trial court abused its discretion in finding that the State met its burden of establishing Wesley's unavailability. To begin, the number of attempts to serve Wesley was never established. Counsel stated that investigators tried to serve Wesley not "just one time" but "more than once." From this, all that can definitively be concluded is that service was attempted twice. Though the State represented that it would continue to try to serve Wesley, it never advised the trial court as to any additional attempts at service, even when the issue was affirmatively raised again at the pretrial status hearings.

¶ 104   Significantly, the State never asserted that further attempts to serve Wesley would be futile; to the contrary, as discussed, it represented that it would continue such attempts. However, the record does not reflect any continued attempts, and the State never sought a continuance to secure Wesley's presence. As defendant points out, the State could have sought a continuance without running afoul of the speedy-trial statute, as the case was within the 120-day window, and the State also could have requested a 60-day extension of this time period. See 725 ILCS 5/103-5(c) (West 2016). On the issue of timing, we also note that, based upon the State's assertions in the record, the State did not issue the subpoena until October 20, 2017—six weeks after the trial date had been

set. This delay substantially limited the time to effectuate service before the November 13, 2017, trial.

¶ 105 We further note that even a remote possibility that affirmative measures would have succeeded is relevant in assessing the State's good-faith efforts to produce a witness. See *Torres*, 2012 IL 111302, ¶ 54. Here, according to the State's proffer, the sole method employed to procure Wesley's attendance at trial was attempted service at Wesley's father's home. Despite the proffered account of hostility and lack of cooperation from Wesley's family, the record reflects no efforts by the State to ascertain whether Wesley resided elsewhere, attended school, or was employed. There was no suggestion of efforts made to locate any known associates or to question individuals in the community about Wesley's whereabouts. Equally troubling is that a thorough check of court records would have disclosed the pending criminal misdemeanor case against Wesley in the same circuit, where he presumably was appearing after the instant case had been set for trial, given that there was no suggestion of failure-to-appear warrants and that Wesley ultimately received court supervision. The State could have had Wesley served in open court after the trial was set. Indeed, upon locating Wesley in court, the State could even have filed a motion to declare Wesley a material witness and requested that he be held without bond if he refused to sign a written undertaking to appear at trial. See 725 ILCS 5/109-3(d) (West 2016); *People v. Johns*, 2016 IL App (1st) 160480, ¶ 12. *Cf. Smith*, 275 Ill. App. 3d at 215 (holding that the State made good-faith efforts to locate a witness where investigators attempted to serve the witness on three occasions at two different addresses, called the public aid office, spoke with security at the witness's former apartment building to ascertain his whereabouts, contacted the county jail and morgue, and asked a detective to look for the witness). Simply put, the record reflects no efforts made by the State to procure Wesley's attendance by other reasonable means.

¶ 106   Rule 804(a)(5) allows for a finding of unavailability where "the proponent of a statement has been unable to procure the declarant's attendance *** by process or other reasonable means." Ill. R. Evid. 804(a)(5) (eff. Jan. 1, 2011). The trial court's finding that the State made reasonable efforts to secure Wesley's attendance at trial was not reasonable. As set forth above, the record simply does not support a finding that the State undertook the requisite good-faith reasonable efforts to procure Wesley's attendance. To allow the admission of former testimony where the State failed to establish the reasonableness of the steps it took to procure the missing witness's attendance "would encourage laxity rather than diligence and desultory searches rather than systematic and coordinated efforts by the prosecution and whatever investigative arm it employs." *People v. Payne*, 30 Ill. App. 3d 624, 630 (1975). This is particularly concerning here, given the importance of Wesley's testimony as the only eyewitness to the shooting. See *United States v. Quinn*, 901 F.2d 522, 528 (6th Cir. 1990) ("The conclusion that the Government has not satisfied its burden here is reinforced by the crucial nature of [the witness's] testimony to the Government's case."); *United States v. Mann*, 590 F.2d 361, 367 (1st Cir. 1978) ("Th[e] relatively high good[-]faith standard cannot be satisfied by perfunctory efforts, if the rule is not to sanction the government's procuring depositions of witnesses, especially shaky witnesses, but then discourage attempts to bring the witness to trial so long as the government is satisfied with what is in the transcript.").

¶ 107   For these reasons, we hold that the trial court abused its discretion in granting the State's motion *in limine* to admit Wesley's testimony from the first trial.

¶ 108                                                2. *Harmless Error*

¶ 109   As our supreme court has recognized, "the requirement of a prior, 'adequate opportunity to cross-examine' the absent witness is at once both an evidentiary and *constitutional* requisite for

admission of former testimony." (Emphasis in original.) *Torres*, 2012 IL 111302, ¶ 52. This is similarly so as it relates to the question of unavailability, a prerequisite for admitting prior testimony under the confrontation clause. See *Roberts*, 448 U.S. at 65 (sixth amendment confrontation clause establishes a rule of necessity requiring a demonstration of unavailability). To establish that an error of constitutional magnitude was harmless, the State must prove beyond a reasonable doubt that the jury verdict would have been the same absent the error. *People v. Thurow*, 203 Ill. 2d 352, 368-69 (2003).

¶ 110    The State argues that, "[t]o the extent this Court finds that the People could have done more to secure Wesley's presence, the People contend that any error was harmless as Wesley's entire testimony [*sic*] admitted at trial." This tautological response does little to meet the State's burden of establishing that any error in the admission of Wesley's prior testimony was harmless.

¶ 111   Wesley's testimony was a key component of the State's case. Wesley was the only eyewitness to the shooting, and the State relied extensively on Wesley's testimony in its opening and closing arguments. While, as set forth below, we may consider Wesley's testimony for purposes of determining the sufficiency of the evidence for double jeopardy purposes, the question we face in the harmless-error analysis is whether the jury verdict would have been the same without it. See *Thurow*, 203 Ill. 2d at 363. Based upon our review of the record, we conclude that but for Wesley's testimony, the evidence against defendant was at best closely balanced. Thus, the error in the admission of Wesley's testimony was not harmless. See *People v. Williams*, 332 Ill. App. 3d 693, 698-99 (2002) (the erroneous admission of expert witness testimony was not harmless where the evidence was closely balanced). Accordingly, we hold that the erroneous admission of Wesley's prior testimony was not harmless error.

¶ 112                                     3. *Double Jeopardy*

¶ 113   Our reversal of defendant's conviction raises the double jeopardy issue. The double jeopardy clause of the United States Constitution prohibits the State from having another opportunity to try a case unless it has in the first trial presented sufficient evidence to prove the defendant guilty beyond a reasonable doubt. *People v. Johnson*, 2013 IL App (2d) 110535, ¶ 84. Thus, before remanding for a new trial, we are required to rule upon the sufficiency-of-the-evidence issue. *Id.* "If the evidence presented at the first trial, *including the improperly admitted evidence*, would have been sufficient for any rational trier of fact to find the essential elements of the crime proven beyond a reasonable doubt, retrial is the proper remedy." (Emphasis added.) *People v. McKown*, 236 Ill. 2d 278, 311 (2010). However, "[i]f no rational trier of fact could so find, defendant may not be subjected to a second trial." *Id.*

¶ 114   As discussed in addressing defendant's challenge to the sufficiency of the evidence, we have carefully reviewed the record in the light most favorable to the prosecution and concluded that the evidence sufficiently supports the verdict beyond a reasonable doubt. We therefore remand the cause for a new trial. Our determination, however, is not binding on retrial and does not indicate this court's opinion as to defendant's guilt or innocence.

¶ 115   In light of our holding that defendant is entitled to a new trial, we need not address defendant's remaining arguments.

¶ 116                                    III. CONCLUSION

¶ 117   For the reasons stated, we reverse defendant's conviction of first-degree murder and remand the cause for a new trial.

¶ 118   Reversed and remanded.

---

**No. 2-18-0887**

---

| | |
|---|---|
| **Cite as:** | *People v. Kent*, 2020 IL App (2d) 180887 |

---

| | |
|---|---|
| **Decision Under Review:** | Appeal from the Circuit Court of Winnebago County, No. 13-CF-1611; the Hon. Joseph W. McGraw and the Hon. Fernando L. Engelsma, Judges, presiding. |

---

| | |
|---|---|
| **Attorneys for Appellant:** | James E. Chadd, Thomas A. Lilien, and Christopher McCoy, of State Appellate Defender's Office, of Elgin, for appellant. |

---

| | |
|---|---|
| **Attorneys for Appellee:** | Marilyn Hite Ross, State's Attorney, of Rockford (Patrick Delfino, Edward R. Psenicka, and David S. Friedland, of State's Attorneys Appellate Prosecutor's Office, of counsel), for the People. |

---